890 A.2d 779

**Charles E. MEEKS, Jr.**

v.

**Charles R. DASHIELL, Jr., et al.**

**No. 638, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

Jan. 26, 2006.

Deborah S. Eyler, J., filed a dissenting opinion in which Murphy, C.J., Salmon, James R. Eyler, and Krauser, JJ., joined.

416

James MacAlister (Morton Edelstein, on the brief), Baltimore, for appellant.

Alvin I. Frederick (Jeffrey W. Bredeck, on the brief), Baltimore, for appellee.

Panel: MURPHY, C.J., DAVIS, HOLLANDER, SALMON, JAMES R. EYLER, KENNEY, DEBORAH S. EYLER, ADKINS, KRAUSER, BARBERA, SHARER, MEREDITH, PAUL E. ALPERT (Retired, specially assigned), JJ.

MEREDITH, J.

Charles E. Meeks, Jr. ("Meeks"), appellant, filed suit in the Circuit Court for Wicomico County, alleging legal malpractice on the part of his former attorneys, Charles R. Dashiell, Jr., and Dashiell's law firm, Hearne and Bailey, P.A. (collectively referred to as "Dashiell" or "appellees"). Meeks alleged that he had engaged Dashiell to draft a prenuptial agreement in 1989, prior to his marriage to Melanie Davis ("Davis"). Meeks alleged that Dashiell reviewed with him a draft of the agreement that included, among other provisions, a waiver of alimony on the part of Davis. Meeks further alleged that Dashiell, without consulting Meeks, deleted the alimony waiver from the final draft, and then directed Meeks to sign the agreement without rereading it. As a consequence, Meeks alleged, he did not learn until approximately 12 years later, when the marriage disintegrated, that his prenuptial agreement lacked a waiver-of-alimony provision. Nevertheless, during the course

of the divorce proceedings subsequently initiated by Meeks, Meeks filed a motion for the court to declare the prenuptial agreement enforceable as executed. The motion was granted, and Meeks ended up paying alimony to Davis.

Meeks then sued Dashiell, alleging that Dashiell was negligent in deleting the alimony waiver and counseling Meeks to sign the prenuptial agreement without rereading it. Dashiell responded to the complaint with a motion to dismiss or, in the alternative, for summary judgment, arguing that the malpractice claim was barred by judicial estoppel, or barred by the three-year statute of limitations, or fatally defective in its allegations as to causation. After a hearing, the motion judge ruled that judicial estoppel did not bar the claim, but nevertheless granted appellees' motion for summary judgment, ruling that the statute of limitations period had expired three years after the date Meeks signed the prenuptial agreement. This appeal followed.

Meeks contends that the motion judge erred in failing to apply the discovery rule. In response, Dashiell urges us to affirm the motion court's ruling that the malpractice claim was barred by the statute of limitations. Alternatively, Dashiell contends that, even if the motion court erred in granting the motion on the basis of the statute of limitations, we should nevertheless affirm the judgment for the appellees by ruling that the motion court erred in failing to grant the motion based upon the doctrine of judicial estoppel.

We shall hold that the motion court erred in ruling as a matter of law that the malpractice claim was barred by the statute of limitations; and we shall not disturb the motion court's denial of the summary judgment motion based upon judicial estoppel. Accordingly, we shall vacate the judgment and remand the case for further proceedings.

## BACKGROUND

Because this case was decided by the Circuit Court for Wicomico County in a ruling upon Dashiell's motion for summary judgment, we must consider the facts in a light most

favorable to Meeks as the non-moving party. *International Broth. of Teamsters v. Willis Corroon Corp.*, 369 Md. 724, 728, 802 A.2d 1050 (2002). As this Court has stated many times, in our review of a summary judgment ruling, "we evaluate 'the same material from the record and decide[ ] the same legal issues as the circuit court.' " *Mitchell v. AARP*, 140 Md.App. 102, 114, 779 A.2d 1061 (2001) (quoting *Lopata v. Miller*, 122 Md.App. 76, 83, 712 A.2d 24, *cert. denied*, 351 Md. 286, 718 A.2d 234 (1998)).

In his complaint filed against Dashiell in this case, which we will set forth in full, Meeks alleged the following:

1. In approximately mid-October, 1989, [Meeks] retained Charles R. Dashiell, Jr., principal, employee and agent of the law firm of Hearne & Bailey, P.A., to draw an antenuptial agreement between his fiancé, Melanie Davis[,] and himself.

2. The agreement, among other provisions, was to contain a waiver of alimony by Melanie Davis.

3. [I]n fact, an initial draft of the agreement contained a clause in which Ms. Davis waived her right to alimony.

4. [O]n or about November 3, 1989, the parties signed the antenuptial agreement and then married on the following day.

5. Prior to Mr. Meeks executing the antenuptial agreement, Mr. Dashiell assured Mr. Meeks that everything was fine and directed him to sign the same.

6. Mr. Meeks, at all times during the drafting and execution of the agreement, relied upon the advice and representations of Charles R. Dashiell, Jr.

7. Unbeknownst to Mr. Meeks, the waiver of alimony provision that had been contained in the draft was not contained in the antenuptial agreement that was presented to the parties for signature.

8. On or about May 10, 2001, the Plaintiff and his wife, Melanie Davis Meeks[,] separated.

9. As a result of the separation, Mr. Meeks turned his attention to the antenuptial agreement and discovered that he may be responsible for the payment of alimony because the waiver of alimony provision was not contained in the executed agreement.

10. The Defendant, Charles R. Dashiell, Jr., was negligent in drawing the antenuptial agreement without a waiver of alimony provision; was further negligent in not being aware that the agreement did not have a waiver of alimony provision; and/or was negligent in not advising the Plaintiff that the agreement did not contain a waiver of alimony; and was negligent in directing the Plaintiff to sign the agreement when the [sic] Charles R. Dashiell, Jr. knew or should have known that the alimony waiver provision was not contained therein and knew or should have known that the Plaintiff did not know that the original draft had been modified.

11. The Plaintiff was not contributorily negligent.

12. As a result of the negligence of the Defendants, the Plaintiff has been caused to incur legal fees and has been required to pay alimony.

Wherefore, the Plaintiff claims damages of Seven Hundred[ ] Fifty Thousand Dollars ($750,000.00) against both Defendants.

No answer was filed in the case. Instead, Dashiell's initial response to Meeks's complaint was a motion entitled "Motion to Dismiss, or in the alternative, Motion for Summary Judgment." Because the motion relied upon three attached exhibits that were not part of the complaint, we shall treat Dashiell's motion as a motion for summary judgment. *See* Maryland Rule 2–322(c).

In the motion for summary judgment, Dashiell asserted that "the material facts in this case are undisputed and judgment should be entered for the Defendants as a matter of law." The motion set forth three alternative bases for entering judgment for Dashiell: "[1] The Plaintiff's claim is barred

under the doctrine of judicial estoppel. [2] The Plaintiff's claim is also barred under the applicable statute of limitations. [3] The Plaintiff's cause of action fails since the Defendants did not cause the alleged damages."

Dashiell attached to the motion for summary judgment a supporting memorandum of points and authorities, as well as three exhibits. There was no supporting affidavit filed with the motion, but in a footnote in Dashiell's supporting memorandum, Dashiell urged the court to take judicial notice of the exhibits. The footnote stated:

> Maryland Rule 5–201 provides that "a judicially noticed fact must be one that is not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Attached hereto as Exhibit 1 is the Complaint for Divorce in the matters styled as *Meeks v. Meeks*, Case No. 23–C–02–0156 in the Circuit Court for Worcester County. Exhibit 2 is the Motion to Enforce the Antenuptial Agreement in the matters styled as *Meeks v. Meeks*, Case No. 23–C–02–0156 in the Circuit Court for Worcester County. Exhibit 3 is the Docket Entries in the matters styled as *Meeks v. Meeks*, Case No. 23–C–02–0156 in the Circuit Court for Worcester County. The Court may take judicial notice of these proceedings.

In Dashiell's supporting memorandum, he emphasized that Meeks's Complaint for Divorce, filed in the Worcester County divorce action, included as one of its several prayers for relief a request that Davis "be awarded rehabilitative alimony." Dashiell further emphasized that, in the divorce action, Meeks had filed a motion asking the Circuit Court for Worcester County to enforce the antenuptial agreement dated November 3, 1989. There was no mention in Meeks's motion of any dissatisfaction on his part with the terms of that agreement. The docket entries from the divorce action reflect that after Meeks filed the motion to enforce the prenuptial agreement, the Circuit Court for Worcester County conducted a hearing and granted the motion. The docket entry for June 11, 2003, states: "Court finds the Antenuptial Agreement to be a valid

agreement, and Grants the Motion to Enforce the Antenuptial Agreement."

Meeks filed an opposition to Dashiell's motion for summary judgment. Meeks asserted that there were genuine disputes of material facts, and that Dashiell was not entitled to judgment as a matter of law. Meeks supported his opposition with a legal memorandum and five exhibits. Two of the exhibits Meeks submitted were duplicates of two of the exhibits to Dashiell's motion, namely, Meeks's Complaint for Divorce and Meeks's Motion to Enforce Antenuptial Agreement. In addition, Meeks filed a copy of Davis's answer to the complaint for divorce, in which Davis "admit[ted] ... that the parties entered into an Antenuptial Agreement on November 3, 1989, but [denied] the allegation that the Agreement is valid, enforceable or governs the distribution of the majority of the property owned by the parties." Meeks also filed a copy of Davis's Counter–Complaint for Absolute Divorce, in which she requested, among other relief, an award of *pendente lite* alimony, as well as rehabilitative and permanent indefinite alimony. Finally, Meeks filed an affidavit in which Meeks made oath as follows:

1. I am a competent person over 18 years of age.

2. In 1989, prior to my marriage to my wife, Melanie D. Meeks, I met with my attorney, Charles R. Dashiell, Jr., of Hearne and Bailey, P.A., and we reviewed a draft of the antenuptial agreement which contained a waiver of alimony provision.

3. On November 3, 1989, I executed the antenuptial agreement presented to me by my attorney, Charles R. Dashiell, Jr. of Hearne and Bailey, P.A.

4. I was not made aware of any negotiations that occurred between the time that I reviewed the draft of the antenuptial agreement and the execution of the final agreement that related to alimony.

5. Prior to executing the antenuptial agreement, I was not advised by my attorney, Charles R. Dashiell, Jr., or any other individual employed by Hearne and Bailey, P.A.,

that the waiver of alimony provision had been removed from the agreement.

6. I first discovered that the waiver of alimony provision was not in the executed antenuptial agreement when I consulted with an attorney in 2001 regarding a divorce from my wife, Melanie D. Meeks.

7. The inclusion of the rehabilitative alimony clause in the Complaint for Divorce filed on my behalf was an attempt to mitigate any alimony award given to my wife, Melanie D. Meeks. I had no interest and gained no benefit in having an alimony award granted to my estranged wife.

No additional affidavits, transcripts, or exhibits were presented to the Circuit Court for Wicomico County by either party.[1]

At the hearing on Dashiell's motion for summary judgment, the motion judge took issue with Dashiell's contention that Meeks was attempting to pursue a remedy in the malpractice action that was clearly inconsistent with Meeks's successful efforts to enforce the prenuptial agreement, as executed, in the Worcester County divorce action. The following colloquy appears in the transcript from the hearing on Dashiell's motion for summary judgment:

[COUNSEL FOR DASHIELL]: In this court he says it wasn't my deal.

THE COURT: No, wait a minute. But I don't understand why his position is inconsistent.

---

1. We have summarized in great detail the state of the record at the time the Circuit Court for Wicomico County ruled upon Dashiell's motion for summary judgment. The minority suggests that we should supplement the record from the Circuit Court for Wicomico County by taking judicial notice, *nostra sponte*, of the complete record of the divorce proceedings in Worcester County, and that, after retrieving that file, we should comb through the record of that case to see if there is additional evidence that would support a decision to bar Meeks's suit on the basis of judicial estoppel. For the reasons stated more fully in the final section of this opinion, we are not persuaded that this is a case in which we should consider evidence outside the record, *see* Rule 8–413, and we have limited our analysis to the record of the Circuit Court for Wicomico County.

[COUNSEL FOR DASHIELL]: It's inconsistent, Your Honor, because in Worcester County he says to the Court in his motion to enforce the settlement, this was my agreement.

THE COURT: He said I entered into a contract, and the contract did not provide for a waiver of alimony.

[COUNSEL FOR DASHIELL]: And he says—

THE COURT: That's what he said.

[COUNSEL FOR DASHIELL]: And he says to the Court, Judge, in Worcester County, this is my deal, specifically enforce it, honor it, meaning that it's the full and final agreement of the parties. It's everything that—

THE COURT: Right, it was the agreement of the parties. And the reason it was the agreement was because your client was negligent, is what he is saying, I don't know if that fact is true but—

[COUNSEL FOR DASHIELL]: I understand.

THE COURT:—that's what he is saying. He is saying this was the agreement that I entered into. And the only reason I have this agreement, though, is because your client was negligent.

* * *

THE COURT: Would the unilateral mistake of one party prevent the prenup[tial agreement] from being enforceable?

[COUNSEL FOR DASHIELL]: In a vacuum, no. But when the opposing party is saying, don't enforce it, it's not my deal, that wasn't it, which is what she's saying—

THE COURT: Well, no, but he is saying, you know, I wanted what I got plus a waiver of alimony.

[COUNSEL FOR DASHIELL]: And the argument I have for you is, if the Court in Worcester [County] has the facts that's in this case before it, that is, it wasn't my deal, I didn't intend to sign that—

THE COURT: So you are saying that he has to say, all right, I don't want anything in the agreement, I'll be a lot

worse off, not just don't I have a waiver of alimony, I don't have the waiver with respect to property and everything, I have to take everything bad, instead of just what your client did wrong.

[COUNSEL FOR DASHIELL]: No. What I'm saying, Your Honor, is he has got to take a consistent position. If he tells the Court in Worcester that's my deal, that's what I intended—

THE COURT: He said that's the deal I entered into. He didn't say that's the one I wanted.

[COUNSEL FOR DASHIELL]: Well, actually he did say that's—

THE COURT: No, no, he is saying that's the contract, the agreement I entered into with my wife. And in here he is saying that is the agreement I entered into with my wife, the reason I entered into it was because your client was negligent.

\* \* \*

THE COURT: He says this is the final agreement that we entered into. The reason we entered into it here he's saying is because your client was negligent.

[COUNSEL FOR DASHIELL]: He says to the Court in Worcester, I had offer, acceptance and consideration on these terms. He says to this Court I didn't really mean to enter that agreement. That wasn't my agreement. That's the distinction.

THE COURT: He is not saying I didn't enter into that agreement. He is saying I entered into that agreement because your client was negligent. He is not saying that was not the agreement I entered into.

After hearing further argument, the motion judge ruled from the bench:

THE COURT: All right.

I don't think there is any judicial estoppel. However, this agreement was signed 11 years before[.] I believe the Defendant is charged with knowing the contents of the

document that he signed, and that his limitations would have begun [at] the time of the execution of the document. And the Court is going to grant the motion to dismiss based on limitations.

## DISCUSSION

### 1. Standard of Review

In this case, the motion judge essentially made two separate rulings with respect to Dashiell's motion for summary judgment. The motion court denied Dashiell's motion to the extent it was founded upon judicial estoppel; and the court granted Dashiell's motion based upon the statute of limitations. These two rulings regarding Dashiell's motion for summary judgment—one refusing to grant the motion on one basis, but the other granting the motion on another basis—are reviewed under different standards on appeal.

When a motion court grants a motion for summary judgment, we first review the record to determine whether there was a genuine dispute as to any material fact. In making that assessment, all facts, including all reasonable inferences therefrom, must be viewed in a light most favorable to the nonmoving party. *Teamsters v. Corroon Corp., supra,* 369 Md. at 728, 802 A.2d 1050. Unless the dispositive facts are free from genuine dispute, the motion court must deny the motion. *Frederick Road v. Brown & Sturm,* 360 Md. 76, 93–94, 756 A.2d 963 (2000); *Pittman v. Atlantic Realty,* 359 Md. 513, 537–39, 754 A.2d 1030 (2000). "In reviewing the propriety of [a judgment granting] a summary judgment motion, we cannot consider evidence or claims asserted after the motion court's ruling." *Baltimore v. Ross,* 365 Md. 351, 361, 779 A.2d 380 (2001). *See also Flaherty v. Weinberg,* 303 Md. 116, 139 n. 9, 492 A.2d 618 (1985) (appellate court disregards documents that were not before the court at the time of the ruling on the demurrer "[r]egardless of the persuasiveness of the documents"). *Cf.* Maryland Rule 2–501(f) ("The court shall enter judgment in favor of or against the moving party *if the motion and response show* that there is no genuine dispute as

to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law.") (emphasis added).

If the motion court has granted the motion for summary judgment, after we confirm that there was no genuine dispute as to any fact, we then review the motion court's ruling for legal error. "In appeals from grants of summary judgment, Maryland appellate courts, as a general rule, will consider only the grounds upon which the lower court relied in granting summary judgment." *PaineWebber v. East,* 363 Md. 408, 422, 768 A.2d 1029 (2001). In making our review of the grant of a motion for summary judgment, we need not defer to the motion court's determination of questions of law. *Helinski v. Harford Memorial,* 376 Md. 606, 614, 831 A.2d 40 (2003); *Comptroller v. Gannett,* 356 Md. 699, 707, 741 A.2d 1130 (1999).

Upon an appeal challenging the *denial* of a motion for summary judgment, on the other hand, the appellate courts adopt a more deferential approach. The Court of Appeals explained in *Metropolitan Mtg. Fd. v. Basiliko,* 288 Md. 25, 28, 415 A.2d 582 (1980):

> [W]hereas a "court cannot draw upon any discretionary power to grant summary judgment" (6 Pt. 2 *Moore's Federal Practice* ¶ 56.15[6], at 56–601 (2d ed.1980)), it, ordinarily, does possess discretion to refuse to pass upon, as well as discretion affirmatively to deny, a summary judgment request in favor of a full hearing on the merits; and this discretion exists even though the technical requirements for the entry of such a judgment have been met.

In the *Basiliko* case, the Court of Appeals was urged by the appellant to reverse the denial of a summary judgment motion in a case that had been tried on its merits, resulting in a judgment adverse to the appellant. The Court refused, stating, *id.* at 29, 415 A.2d 582:

> [W]e now hold that a denial (as distinguished from a grant) of a summary judgment motion ... involves not only pure legal questions but also an exercise of discretion as to

whether the decision should be postponed until it can be supported by a complete factual record; and we further hold that on appeal, absent clear abuse (not present in this case), the manner in which this discretion is exercised will not be disturbed.

In *Foy v. Prudential Ins. Co.*, 316 Md. 418, 424, 559 A.2d 371 (1989), the case reached the Court of Appeals in a procedural posture somewhat similar to the present case. The circuit court had granted summary judgment for the defendants on one theory, and had denied the plaintiff's cross motion for summary judgment. The plaintiff, as appellant, urged the Court of Appeals to rule that the motion court had erred in refusing to grant her motion for summary judgment. Declining to reverse the denial of a motion for summary judgment, the Court stated:

> It follows from our holdings in *Fenwick* [*Motor Co. v. Fenwick*, 258 Md. 134, 265 A.2d 256 (1970),] and *Basiliko* that ordinarily no party is entitled to a summary judgment as a matter of law. It is within the discretion of the judge hearing the motion, if he finds no uncontroverted material facts, to grant summary judgment or to require a trial on the merits. It is not reversible error for him to deny the motion and require a trial. Since the motions judge did not grant summary judgment in favor of [the appellant,] and ordinarily no party is ever entitled to summary judgment as a matter of law, it would be improper for us to determine how the motions judge might have exercised his discretion and now determine that summary judgment should have been granted in favor of the plaintiff. Accordingly, in this case we shall ... remand for further proceedings consistent with this opinion.

*Accord Mathis v. Hargrove*, 166 Md.App. 286, 304–06, 888 A.2d 377 (2005) (motion court has discretion to deny motion for summary judgment even when all technical requirements are met by movant).

## 2. Statute of Limitations

■ The prenuptial agreement that is the basis of Meeks's alleged legal malpractice claim against Dashiell was executed

by Meeks on November 3, 1989. The complaint asserting the malpractice claim was filed on October 24, 2003. Dashiell asserted in the motion for summary judgment that "Maryland law presumes that [Meeks] knew the contents of the [prenuptial] contract he signed in 1989. The contract did not contain a waiver of alimony provision. Because thirteen years have passed from the date the contract was signed, and [Meeks] had knowledge of the lack of an alimony provision, this claim is barred under the applicable three-year statute of limitations."

In Meeks's affidavit filed in opposition to the motion for summary judgment, however, Meeks asserted, under oath: "I first discovered that the waiver of alimony provision was not in the executed antenuptial agreement when I consulted with an attorney in 2001 regarding a divorce from my wife, [Davis]." Meeks further asserted in his affidavit that when he had, prior to the date of signing, reviewed a draft of the proposed prenuptial agreement, the draft "contained a waiver of alimony provision"; that he "was not made aware of any negotiations that occurred between the time [he] reviewed the draft of the antenuptial agreement and the execution of the final agreement that related to alimony"; and that "[p]rior to executing the antenuptial agreement, [Meeks] was not advised by [his] attorney, Charles R. Dashiell, Jr., or any other individual employed by Hearne and Bailey, P.A., that the waiver of alimony provision had been removed from the agreement."

The motion judge apparently discounted Meeks's sworn statement that he had no actual awareness that the waiver-of-alimony provision had been deleted by his attorney without Meeks's knowledge from the final draft of the prenuptial agreement. The motion court accepted Dashiell's argument, based upon *Merit Music v. Sonneborn*, 245 Md. 213, 221–22, 225 A.2d 470 (1967), that Meeks was presumed to know the contents of the document he signed. The motion court treated such presumed knowledge as sufficient to establish as a matter of law that Meeks was on inquiry notice of his potential malpractice claim the day he signed the document in question.

Accordingly, the motion court ruled that Meeks was "charged with knowing the contents of the document that he signed, and that his [statute of] limitations would have begun [at] the time of the execution of the document."

■ We conclude that the motion court erred in so holding. The principle that a party to a contract is bound by his signature even if he neglects to read the contract is a point of contract law that precludes one party to a contract from denying that the terms of the contract are binding. It is not directly applicable to a negligence claim against a tortfeasor who was not a party to the contract; and it does not conclusively establish as a matter of law that the statute of limitations for a legal malpractice claim against the attorney who prepared the contract expires three years after the date the contract was signed. This is particularly so when, as alleged in this case, the attorney assures the client that the document is ready for the client's signature and advises the client to sign the document without rereading it.

Meeks has alleged in this case that his attorney: reviewed with him a draft agreement; subsequently made a revision to the proposed agreement that made it more favorable to Davis; failed to advise the client of the change made by the attorney; and then directed the client to sign the contract without highlighting for the client a material change. Meeks alleged that, as a consequence of his reliance upon Dashiell, Meeks did not discover until 2001 that the agreement he signed did not contain the alimony waiver he had seen in the draft agreement. Such allegations were supported by affidavit, and if they can be proved, the statute of limitations for legal malpractice would not have begun to run at the time the client signed the document in reliance upon his attorney. *See Mumford v. Staton, Whaley and Price*, 254 Md. 697, 714, 255 A.2d 359 (1969) (discovery rule applies to claims of legal malpractice).

In *Frederick Road, supra*, 360 Md. at 94, 756 A.2d 963, the Court of Appeals noted that "[a] grant of summary judgment is appropriate where the statute of limitations governing the

action at issue has expired." But the Court also emphasized that the discovery rule generally requires factual determinations that are inappropriate for resolution by summary judgment. The Court stated, *id.* at 95–96, 756 A.2d 963:

> Recognizing the unfairness inherent in charging a plaintiff with slumbering on his rights where it was not reasonably possible to have obtained notice of the nature and cause of an injury, this Court has adopted the discovery rule to determine the date of accrual [of a cause of action]. *Hahn v. Claybrook,* 130 Md. 179, 186–187, 100 A. 83, 85–86 (1917). The discovery rule tolls the accrual of the limitations period until the time the plaintiff discovers, or through the exercise of due diligence, should have discovered, the injury. Thus, before an action is said to have accrued, a plaintiff must have notice of the nature and cause of his or her injury. *See, Pennwalt [v. Nasios],* 314 Md. [433,] 453, 550 A.2d [1155, 1165–66 (1988) ] (holding that limitations do not begin to run until a plaintiff knows or reasonably should know the nature and cause of his or her harm.). *See also, United Parcel [v. People's Counsel],* 336 Md. [569,] 579, 650 A.2d [226,] 231 [ (1994) ] (holding that "a cause of action 'accrues' within the meaning of [Maryland Code (1973, 1989 Repl.Vol., 1994 Cum.Supp.), Courts and Judicial Proceedings Article,] § 5–101 when 'the plaintiff knows or should know of the injury, its probable cause, and ... [the defendant's] wrongdoing ....' ")(citing *Hecht [v. Resolution Trust Corp.],* 333 Md. [324,] 336, 635 A.2d [394,] 400 (1994)). Aware that the question of notice generally requires the balancing of factual issues and the assessment of the credibility or believability of the evidence, this Court in *O'Hara v. Kovens,* 305 Md. 280, 503 A.2d 1313 (1986), made clear:

> > "whether or not the plaintiff's failure to discover his cause of action was due to failure on his part to use due diligence, or to the fact that defendant so concealed the wrong that plaintiff was unable to discover it by the exercise of due diligence, is ordinarily a question of fact for the jury."

*Id.* at 294–295, 503 A.2d at 1320. (citations and internal quotations omitted).

*Accord Supik v. Bodie,* 152 Md.App. 698, 709–11, 834 A.2d 170 (2003). *Cf. Bank of New York v. Sheff,* 382 Md. 235, 247, 854 A.2d 1269 (2004) ("Limitations began to run when the [client] was on inquiry notice that financing statements may not have been filed, triggering a duty on [client's] part to make an investigation that, if diligently pursued, would have revealed the sad fact [*i.e.,* the alleged malpractice].")

In the present case there was a genuine dispute of fact regarding the date Meeks had notice of the nature and cause of his injury. According to Meeks's affidavit, he did not gain actual notice that the waiver-of-alimony provision had been deleted from the final draft of the prenuptial agreement until sometime in 2001. Although Dashiell argues that Meeks had an obligation to read the prenuptial agreement and learn of the omission at the time he signed the contract, as the Court of Appeals noted in *Frederick Road, supra,* 360 Md. at 101–03, 756 A.2d 963, a client has the right to rely upon his own attorney. And unlike the client in the *Sheff* case who received several post-settlement communications that put the client on inquiry notice of the alleged legal malpractice, 382 Md. at 246–47, 854 A.2d 1269, there was no evidence before the motion court in Meeks's case that would support a finding as a matter of law that something happened prior to 2001 that would have put Meeks on inquiry notice to investigate whether the signed prenuptial agreement contained the waiver-of-alimony provision he had seen in the draft.

The Court of Appeals reviewed the development of the discovery rule in *Hecht v. Resolution Trust Corporation,* 333 Md. 324, 336–37, 635 A.2d 394 (1994), and noted that mere constructive knowledge is not adequate to start the running of the limitations period:

> The discovery rule requires that the plaintiff must have notice of a claim to start the running of limitations. We defined such notice in *Poffenberger* [*v. Risser,* 290 Md. 631, 431 A.2d 677 (1981),] as "express cognition[,] or awareness

implied from 'knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [thus charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued.' " 290 Md. at 637, 431 A.2d 677, quoting *Fertitta v. Bay Shore Dev. Corp.*, 252 Md. 393, 402 [250 A.2d 69] (1969) (citations omitted). In *Poffenberger*, the defendant, a builder, conceded that the plaintiff did not have express knowledge of the defendant's negligence, which resulted in plaintiff's home being built in violation of set-back requirements, until some four years after the construction, when a neighboring lot was surveyed and plaintiff was informed that his home was too close to the dividing line between the two lots. 290 Md. at 633, 431 A.2d 677. However, the defendant argued that the plaintiff had constructive knowledge of the negligence at the time the house was built, because the plats and deeds were recorded. We explicitly rejected this argument, holding that this type of knowledge did not constitute the requisite knowledge within the meaning of the rule. *Id.* at 637, 431 A.2d 677. *We made it clear that merely constructive notice—which rests not on facts but on strictly legal presumptions—was insufficient, maintaining that it would "recreate the very inequity the discovery rule was designed to eradicate."* 290 Md. at 637, 431 A.2d 677.

(Emphasis added.)

In the context of a negligence claim against an insurance agent made by an insured who failed to read the policy, the Court of Appeals has pointed out that, although there may be some circumstances in which that failure to read the insurance contract will bar recovery by the insured as a matter of law, *see, e.g., Twelve Knotts Ltd. v. Fireman's Fund Ins. Co.*, 87 Md.App. 88, 104–05, 589 A.2d 105 (1991), "the duty [of the insured] is not necessarily to read the policy but simply to act reasonably under the circumstances. In some settings, acting reasonably may well require the insured to check parts of the policy or accompanying documents; in many settings, it will not." *Teamsters v. Corroon Corp., supra,* 369 Md. at 739, 802

A.2d 1050. The Court observed in *Teamsters* that the reasonableness of the insured's conduct in failing to read the policy in such cases "normally will be fact-specific and therefore, where there is any genuine dispute of relevant fact, for the trier of fact to determine." *Id.* at 740, 802 A.2d 1050. Noting various factors that could enter into that determination, including the question of "how much reliance was justifiably placed in the agent or broker by the insured," *id.*, the Court concluded that "summary judgment was inappropriate" in that case. *Id.* at 741, 802 A.2d 1050.

Similarly, in Meeks's case, it was not appropriate for the motion court to grant summary judgment on the statute of limitations issue merely because of the presumption in contract law that Meeks was on notice of everything that he could have known if he had read the prenuptial agreement at the time of signing the document. Considering the facts set forth in Meeks's affidavit in the light most favorable to Meeks, who was the non-moving party, a finder of fact could infer: that Dashiell reviewed with Meeks a draft of the agreement that contained a waiver-of-alimony provision; that Dashiell made further revisions to the agreement, presumably to satisfy opposing counsel, before presenting it to Meeks for Meeks's signature; that neither Dashiell nor anyone else advised Meeks before he signed the agreement that one of the revisions was the deletion of the waiver-of-alimony provision; that Meeks relied upon his attorney; that no subsequent event transpired that should have prompted Meeks to read the executed agreement before he did so in 2001; and that Meeks did not, in fact, discover the deletion of the alimony waiver until 2001. If the finder of fact makes such findings, then, in the absence of a finding of fact based on some evidence not before us that a reasonable person in Meeks's position would have discovered the deletion of the alimony waiver at some point in time before 2001, the statute of limitations did not begin to run until the discovery in 2001, and the malpractice suit filed against Dashiell in 2003 was not time-barred. Accordingly, we hold that the motion court erred in granting

summary judgment for Dashiell because of the statute of limitations.

In so ruling, we are not holding as a matter of law that Meeks's cause of action did not accrue until he read the agreement in 2001. We hold instead that the motion court erred in ruling as a matter of law that the cause of action accrued on the date of execution of the prenuptial agreement, and, based upon the record that was before the motion court, we cannot say as a matter of law that Meeks's cause of action accrued more than three years before suit was filed. Because our holding requires reversal, we need not address Meeks's alternative argument that his cause of action could not accrue until he incurred damages beyond the attorney's fee paid for preparing the prenuptial agreement.

## 3. Judicial Estoppel

■ Dashiell argues that, even if we reverse the motion court on the statute of limitations issue, we should nevertheless affirm the judgment in favor of the defendants. Dashiell contends that the motion judge erred in failing to grant the motion for summary judgment on the basis of judicial estoppel.

On this issue, Dashiell urges us to reverse the denial of a motion for summary judgment. As indicated above, we ordinarily will uphold the discretion of a motion judge to deny a motion for summary judgment, *Foy, supra,* 316 Md. at 424, 559 A.2d 371, although, applying an abuse of discretion standard, we may reverse such a ruling where the facts are undisputed and there is clearly no other possible correct legal outcome. *See, e.g., Presbyterian Hospital v. Wilson,* 99 Md. App. 305, 313–14, 637 A.2d 486 (1994) ("Where, however, a motion for summary judgment is based upon a pure issue of law that could not properly be submitted to a trier of fact, as such, to resolve, the conclusion in *Basiliko* that the denial of summary judgment will not be reviewed on appeal is inapplicable."), *aff'd,* 337 Md. 541, 548–49, 654 A.2d 1324 (1995). *See also Jones v. State,* 379 Md. 704, 714, 843 A.2d 778 (2004)

("While the authority [of the appellate courts] to review unpreserved issues is discretionary, it should not be exercised where it will work an unfair prejudice to the parties.").

Based upon our review of the documents in the record that was before the motion judge at the time he ruled upon Dashiell's motion, we conclude that the motion judge did not abuse his discretion in denying Dashiell's motion to grant summary judgment based upon judicial estoppel. Without prejudice to Dashiell's right to continue to assert a claim of judicial estoppel upon a more fully developed record, we decline Dashiell's invitation to reverse the motion court's denial of the motion for summary judgment on that basis. *Cf. Mathis v. Hargrove, supra,* 166 Md.App. at 306, 888 A.2d 377 ("[R]efusal [to grant motion for summary judgment] is only reviewable upon an abuse of discretion standard.").

Although the phrase "judicial estoppel" was first used by the Court of Appeals in 1966, in *Messall v. Merlands Club, Inc.,* 244 Md. 18, 29, 222 A.2d 627 (1966), the doctrine that precludes a party from seeking an unfair advantage in the courts by asserting a position contrary to one previously taken in an earlier judicial proceeding was recognized by the Court of Appeals at least as early as 1877 in *Edes v. Garey,* 46 Md. 24, 41 (1877). In *Edes,* the Court noted that the plaintiffs had taken a position in prior judicial proceedings that was directly contrary to the claim they were seeking to assert against sureties on a bond. The Court was "of opinion that under the facts and circumstances disclosed by the record, the [plaintiffs] are precluded from recovering against the ... sureties...." *Id.* at 40. After describing the inconsistent claims, the Court stated, *id.* at 41:

This is certainly claiming at one time in one right, and then at another time setting up a claim not only inconsistent with, but in fact utterly denying the first. "A man shall not be allowed," says the Court of Exchequer, in *Cave v. Mills,* 7 *H. & W.* 927 [ (1862) ], "to blow hot and cold, to claim at one time and deny at another."

More recently, in *Berrett v. The Standard Fire Ins. Co.*, 166 Md.App. 321, 340, 888 A.2d 1189 (2005), this Court summarized the doctrine of judicial estoppel as follows:

[T]he doctrine of judicial estoppel ... prohibits a litigant from "blowing hot and cold," by taking one position that is accepted by one court and advocating a completely contrary position in another court, to try to gain advantage. *Vogel v. Touhey*, 151 Md.App. 682, 722 [828 A.2d 268] (2003) (citing *Eagan v. Calhoun*, 347 Md. 72, 88 [698 A.2d 1097] (1997)). The purpose of the doctrine is to protect the integrity of the court system. *Id.*

In *WinMark Limited Partnership v. Miles & Stockbridge*, 345 Md. 614, 628, 693 A.2d 824 (1997), the Court of Appeals explained that the doctrine of judicial estoppel is not grounded in protection of the parties, but rather is intended to preserve the integrity of the judicial system:

The policy underlying judicial estoppel and underlying the clean hands doctrine is the same. "The clean hands doctrine is not applied for the protection of the parties nor as a punishment to the wrongdoer; rather, the doctrine is intended to protect the courts from having to endorse or reward inequitable conduct." [Quoting *Adams v. Manown*, 328 Md. 463, 474–75, 615 A.2d 611 (1992).]

We noted in *Middlebrook Tech, LLC v. Moore*, 157 Md.App. 40, 62–63, 849 A.2d 63 (2004), and also in *Gordon v. Posner*, 142 Md.App. 399, 426–27, 790 A.2d 675, *cert. denied*, 369 Md. 180, 798 A.2d 552 (2002), that courts have typically focused upon three factors in making the determination of whether a party's claim should be barred by judicial estoppel in order to protect the integrity of the courts. In both of those cases we referred to the Supreme Court's analysis in *New Hampshire v. Maine*, 532 U.S. 742, 750–51, 121 S.Ct. 1808, 1815, 149 L.Ed.2d 968 (2001), which stated:

Courts have observed that "[t]he circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle," *Allen* [*v. Zurich Ins. Co.*], 667 F.2d [1162], [ ]1166

[ (C.A.4 1982) ]; accord, *Lowery v. Stovall,* 92 F.3d 219, 223 (C.A.4 1996); *Patriot Cinemas, Inc. v. General Cinema Corp.,* 834 F.2d 208, 212 (C.A.1 1987). Nevertheless, several factors typically inform the decision whether to apply the doctrine in a particular case: First, a party's later position must be "clearly inconsistent" with its earlier position. *United States v. Hook,* 195 F.3d 299, 306 (C.A.7 1999); *In re Coastal Plains, Inc.,* 179 F.3d 197, 206 (C.A.5 1999); *Hossaini v. Western Mo. Medical Center,* 140 F.3d 1140, 1143 (C.A.8 1998); *Maharaj v. Bankamerica Corp.,* 128 F.3d 94, 98 (C.A.2 1997). Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled," *Edwards [v. Aetna Life Ins. Co.],* 690 F.2d [595], [ ]599 [ (C.A.6 1982) ]. Absent success in a prior proceeding, a party's later inconsistent position introduces no "risk of inconsistent court determinations," *United States v. C.I.T. Constr. Inc.,* 944 F.2d 253, 259 (C.A.5 1991), and thus poses little threat to judicial integrity. See *Hook,* 195 F.3d at 306; *Maharaj,* 128 F.3d at 98; *Konstantinidis [v. Chen ],* 626 F.2d [933], [ ]939 [ (C.A.D.C. 1982) ]. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. See *Davis [v. Wakelee ],* 156 U.S. [680], [ ]689, 15 S.Ct. 555, 39 L.Ed. 578 [ (1895) ]; *Philadelphia, W., & B.R. Co. v. Howard,* 13 How. 307, 335–337 [14 L.Ed. 157] (1852); *Scarano [v. Central R. Co.],* 203 F.2d [510], [ ]513 [ (C.A.3 1953) ] (judicial estoppel forbids use of "intentional self-contradiction . . . as a means of obtaining unfair advantage"); see also 18[C.] Wright[, A. Miller, & E. Cooper, FEDERAL PRACTICE AND PROCEDURE] § 4477, p. 782 [ (1981) ].

In enumerating these factors, we do not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel. Additional consider-

ations may inform the doctrine's application in specific factual contexts.

The Court of Appeals gave a similar description of judicial estoppel, albeit in *dicta*, in *Pittman v. Atlantic Realty, supra*, 359 Md. at 529 n. 9, 754 A.2d 1030, a case that addressed the use of "sham affidavits." The Court stated:

The application of judicial estoppel requires: (1) the assertion of a factual "position inconsistent with that taken in prior litigation"; (2) that the "prior inconsistent position must have been accepted by the court"; and (3) that "the party sought to be estopped must intentionally have misled the court to gain unfair advantage." *Sedlack v. Braswell Servs. Group, Inc.*, 134 F.3d 219, 224 (4th Cir.1998).

As we stated in *Roane v. Washington County Hospital*, 137 Md.App. 582, 592, 769 A.2d 263, *cert. denied*, 364 Md. 463, 773 A.2d 514 (2001):

The gravamen of a judicial estoppel claim is one party's inconsistency prejudicing his or her opponent's case. *Wilson v. Stanbury*, 118 Md.App. 209, 215, 702 A.2d 436 (1997). The doctrine in no way hinders parties from vigorously pursuing their claim, including alternative theories of the case.

In the Dashiell case, it appears from the comments made by the motion judge during the hearing on the motion for summary judgment that the judge was not persuaded, based upon his review of only the documents in the motion court's file, that Meeks's claim of malpractice was irreconcilably inconsistent with Meeks's successful motion to enforce the executed antenuptial agreement in the divorce litigation in the neighboring county's circuit court. From our review of the exhibits that were before the motion court at the time of the hearing on the motion for summary judgment, *see* Rule 8–413, we cannot say that the motion judge committed legal error on this point, or that he abused his discretion by refusing to grant Dashiell's motion for summary judgment. *Mathis v. Hargrove, supra*, 166 Md.App. at 306, 888 A.2d 377.

In his motion for summary judgment, Dashiell argued that Meeks's malpractice claims were inconsistent with the position Meeks had pursued during the Worcester County divorce litigation in two regards. (1) In Meeks's complaint for divorce, he specifically included among his prayers for relief a request that Davis "be awarded rehabilitative alimony"; Dashiell asserted that it is inconsistent for Meeks to now allege in his malpractice complaint that, "[a]s a result of the negligence of [Dashiell], [Meeks] has been ... required to pay alimony." (2) In the divorce proceedings, Meeks filed a Motion to Enforce Antenuptial Agreement, which was granted by the Circuit Court for Worcester County; but in the malpractice complaint, Meeks alleged that he did not intend to sign an antenuptial agreement which did not contain a waiver of alimony.

Given the facts in the record at the time the motion judge ruled upon Dashiell's motion for summary judgment, it was not an abuse of discretion to deny Dashiell's motion that summary judgment should be granted for these reasons. With respect to Meeks's request in his complaint for divorce that affirmatively asked the court to award Davis rehabilitative alimony, Meeks filed an affidavit in the malpractice case offering this rationale: "The inclusion of the rehabilitative alimony clause in the Complaint for Divorce filed on my behalf was an attempt to mitigate any alimony award given to my wife, Melanie D. Meeks. I had no interest and gained no benefit in having an alimony award granted to my estranged wife." Meeks's argument seems to be that, because Dashiell had placed him in a position of seeking a divorce without any waiver-of-alimony provision in the only prenuptial agreement signed by his wife, he was not likely to avoid alimony entirely, and his best litigation strategy was to stake out a position urging the court to award rehabilitative alimony only. This argument is not so implausible for us to conclude that the motion judge committed reversible error in failing to reject it. Accordingly, the motion judge did not abuse his discretion by refusing to grant Dashiell's motion for summary judgment on the basis of Meeks having included a prayer that Davis be

awarded rehabilitative alimony. *Cf. Crowley v. Harvey & Battey, P.A.,* 327 S.C. 68, 488 S.E.2d 334, 335 (1997) ("[T]he fact the client has accepted the benefits of the settlement and judicially sought to enforce its terms are not bars to maintenance of a malpractice claim. To hold otherwise would absolve the client of the duty to mitigate damages, and to require her to forego whatever benefit she is entitled to under the settlement in order to maintain a suit against her attorney. . . .").

The Motion to Enforce Antenuptial Agreement that Meeks filed in the divorce proceedings did not include any explicit allegations that the executed prenuptial agreement included all of the terms that Meeks personally believed were in the agreement at the time of signing. The verified motion did, however, aver that the agreement was executed by both parties on November 3, 1989, with both parties having been represented by counsel. The motion to enforce further asserted that each of the parties had "made full and complete disclosure" to the other of the value of all assets owned by each, and that "[t]he terms and provisions of the Agreement control the disposition of several assets presently in possession of the parties[,] including business interests, real estate and pensions."

In Dashiell's memorandum in support of the motion for summary judgment, Dashiell urged the court to rule that the malpractice action was barred by judicial estoppel because of the inconsistency between Meeks insisting upon enforcement of the agreement in the divorce litigation and then alleging that it was not the agreement Meeks believed it to be in the malpractice suit. Dashiell argued: "[I]n this proceeding, having previously taken advantage of the beneficial provisions in the antenuptial agreement, the Plaintiff [Meeks] alleges that the November [3], 1989 antenuptial agreement was not the final agreement. The Plaintiff now asserts that he never agreed to execute an agreement without a waiver of alimony provision."

Based upon Meeks's affidavit and the exhibits in the file, the motion judge rejected Dashiell's characterization of Meeks's claim with regard to the viability of the agreement. Meeks did not allege, in either court proceeding, that the signed agreement was not final and binding upon himself and Davis. To the contrary, because the change he complained of was made by his own attorney, and was agreed to by Davis, Meeks could not rely upon his own failure to read the final draft as an excuse to avoid or reform the agreement. *See Merit Music, supra,* 245 Md. at 221–22, 225 A.2d 470 ("the law presumes that a person knows the contents of a document that he executes and understands at least the literal meaning of its terms"); *Binder v. Benson,* 225 Md. 456, 461, 171 A.2d 248 (1961) ("[I]f there is no fraud, duress, or mutual mistake, one who has the capacity to understand a written document who reads and signs it, or, without reading it or having it read to him, signs it, is bound by his signature as to all of its terms.").

At the argument on the motion for summary judgment, Dashiell's counsel appropriately conceded that a unilateral mistake by Meeks would not prevent the prenuptial agreement from being an enforceable agreement. *See Creamer v. Helferstay,* 294 Md. 107, 121, 448 A.2d 332 (1982) ("a unilateral mistake is ordinarily not a ground for relief from a contract"); *Nationwide Mutual Insurance Co. v. Voland,* 103 Md.App. 225, 234–35, 653 A.2d 484 (1995) (same). The motion judge was not persuaded that a party whose attorney neglected to advise the client of a change to the final execution draft was limited to either rejecting the entire agreement or waiving the alleged error of the attorney. *Cf. Sonnenberg v. Security Management,* 325 Md. 117, 125, 599 A.2d 820 (1992) ("where the allegedly defrauded party has affirmed the contract by conduct and then sued for damages, our cases have permitted a deceit action even though the fraud was discovered while the contract was executory."). *See also Thomas v. Bethea,* 351 Md. 513, 521, 718 A.2d 1187 (1998) ("The issue in the second case is the attorney's negligence, which, ordinarily, was neither raised nor resolved in the action that was settled.").

Upon weighing the value of the property settlement provisions against the possibility of an alimony award, it was not inconsistent for Meeks to take the position that, as between himself and Davis, the signed agreement was an enforceable contract, and also take the position that his attorney either mishandled the preparation of the final agreement or failed to properly advise Meeks of the ramifications of signing the final version. Based upon the record before the motion court in this case, the motion judge did not err in concluding: "[Meeks] is not saying I didn't enter into that agreement. He is saying I entered into that agreement because your client was negligent. He is not saying that was not the agreement I entered into." In light of the facts in the record at the time of the ruling on Dashiell's motion, we conclude that the motion judge did not abuse his discretion in declining to grant summary judgment on the basis of Dashiell's claim that Meeks has taken totally inconsistent positions.[2]

That said, we observed in the briefs filed by Meeks in this Court occasional statements made by appellant's counsel that suggested the deletion of the alimony waiver from the final agreement was solely Dashiell's act, and that such revision was not in accord with the negotiated terms to which Davis had agreed. If that is in fact what happened, such circumstances may demonstrate that there was a mutual mistake that would have supported a claim for reformation, which is

---

2. The minority has concluded that Meeks won a favorable ruling upon his motion to enforce the prenuptial agreement in the Worcester County proceedings specifically because he (through his divorce attorney) argued to that court the waiver-of-alimony provision was negotiated out of the agreement. Based upon that view of the Worcester County proceedings, the minority concludes that it is unfair and totally inconsistent for Meeks to now blame Dashiell for deleting that provision. Dashiell made no such argument, however, in support of his motion for summary judgment in this case, and the excerpts from the divorce proceedings that were filed in this case would not compel such a conclusion. Indeed, the proceedings on the motion to enforce the prenuptial agreement were not even transcribed until after the second round of oral arguments in this Court. Consequently, the specific argument asserted by the minority as the basis for invoking judicial estoppel and reversing the motion court's denial of summary judgment was neither raised in, nor decided by, the motion court.

something never pursued by Meeks in the divorce litigation. Under that scenario, his current claims against Dashiell would appear to be inconsistent with the action he took to enforce the agreement as signed. Similarly, if the factual assertions made by Meeks in support of his claim against Dashiell were to establish that there was never any meeting of the minds between Meeks and Davis, such that the antenuptial agreement was unenforceable, then such assertions would be clearly inconsistent with the action taken by Meeks in the divorce litigation to enforce the agreement.

The documents before the motion judge, however, did not assert that the signed prenuptial agreement was contrary to the terms to which Davis had agreed. To the contrary, the exhibits filed with the motion for summary judgment and response supported a factual inference that the deletion was made at Davis's request during negotiations between counsel, but never communicated to Meeks. Accordingly, the motion judge did not abuse his discretion in refusing to grant Dashiell's motion on this basis. In further proceedings in the present case, however, Dashiell will have the opportunity to develop the facts surrounding this possible inconsistency in Meeks's factual assertions, and the court may revisit this issue as necessary.

As we have tried to make plain throughout this opinion, we do not hold that the denial of Dashiell's motion for summary judgment is necessarily the final word on the merits of the question of whether Meeks's claims against Dashiell should be barred by judicial estoppel. In deference to the discretion of a motion judge to deny a motion for summary judgment, we have viewed the record as it was presented to the motion judge. We leave open the possibility that additional evidence from the Worcester County divorce proceedings and from other witnesses may ultimately lead to a different view of, and outcome on, this issue. *Cf. Eagan v. Calhoun,* 347 Md. 72, 86–88, 698 A.2d 1097 (1997) (Court of Appeals imposed bar of judicial estoppel based upon evidence in the record of case that had been fully litigated).

 We have considered the option of undertaking our own independent review of the Worcester County divorce proceedings to analyze in more detail the degree of any inconsistency between the positions asserted by Meeks in that litigation and the claim he now asserts against Dashiell, but we have rejected that course of action for a number of reasons. First and foremost, the complete record of those proceedings was not available to, or considered by, the motion court in this case. Consequently, except for the five specific exhibits submitted by Dashiell and Meeks in connection with the motion for summary judgment, the records from the Worcester County divorce proceedings are not part of the record in this case. *See* Rule 8–413(a). The divorce court's records were not even in the same courthouse as the one in which the motion was being argued, let alone part of the same court file. *Cf. Baltimore v. Ross, supra,* 365 Md. at 361, 779 A.2d 380 ("In reviewing the propriety of a summary judgment motion, we cannot consider evidence or claims asserted after the motion court's ruling.").

In *Fletcher v. Flournoy,* 198 Md. 53, 60–61, 81 A.2d 232 (1951), the Court of Appeals expressed the view that an appellate court should travel outside the record only in exceptional cases in which the demands of justice require such extraordinary action. The Court stated:

We are asked to say that the lower court—and this court—may take judicial notice of the record in that case in Montgomery County, in the court in which the instant case was instituted and from which it was removed to Howard County. In a recent case of the present plaintiff against Judge Bryan, (*Fletcher v. Bryan,* 175 F.2d 716, 717 [ (4th Cir.1949) ] ) the United States Court of Appeals for the Fourth Circuit quoted and followed a statement in its opinion by Judge Soper in *Morse v. Lewis,* [ ] 54 F.2d 1027, 1029 [ (4th Cir.1932) ], "The general rule undoubtedly is that a court will not travel outside the record of the case before it in order to take notice of the proceedings in another case, even between the same parties[ ] and in the same court, unless the proceedings are put in evidence; and the rule is

sometimes enforced with considerable strictness. * * * But in exceptional cases, as high authority shows, the dictates of logic will yield to the demands of justice, and the courts[,] in order to reach a just result, will make use of established and uncontroverted facts not formally of record in the pending litigation." In the instant case, the demands of justice do not suggest an exception to settled rules.

*Accord Byron Lasky & Assoc. v. Cameron–Brown,* 33 Md. App. 231, 239, 364 A.2d 109 (1976); *but cf. Daniel v. Kensington Homes,* 232 Md. 1, 5, 192 A.2d 114 (1963) (court considered documents outside the record where it appeared that they had been considered by the lower court although not formally moved into evidence); *Temoney v. State,* 290 Md. 251, 259–60, 429 A.2d 1018 (1981) ("judicial notice cannot be taken of the testimony or factual statements made in unrelated trials in other jurisdictions").

A good illustration of a case "in which the demands of justice *do* suggest an exception to settled rules [regarding judicial notice of proceedings outside the record]" is *James v. State,* 31 Md.App. 666, 685, 358 A.2d 595, *cert. denied,* 278 Md. 725 (1976), where we described the justification for us to travel outside the record as follows:

Here, we are confronted with an appeal in a case which has been tried twice, the first resulting in a mistrial. The second trial consumed ten days and some 23 witnesses testified. It would defy logic and any notion of fundamental justice and of judicial economy if this case were to be reversed solely on the ground of a violation of the *Burgett* principle [*Burgett v. Texas,* 389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967) ], when it is a fact of public record that appellant *was* represented by counsel in connection with the prior conviction and, as appears from the decision of the Court of Appeals in *Gill v. State,* 265 Md. 350, 289 A.2d 575 (1972), reversing *Gill v. State,* 11 Md.App. 378, 274 A.2d 667 (1971), we are not permitted the alternative of a remand, without affirmance or reversal, for the limited purpose of receiving in evidence the docket entries in the prior case.

Under such circumstances, we concluded that refusing to take judicial notice of official records of the circuit court that indisputably established the defendant had been represented by counsel in the prior proceedings would "be contrary to the demands of logic and justice." *Id.* at 687, 358 A.2d 595. The present appeal presents no such compelling justification for us to supplement the record by taking judicial notice of other court proceedings.

■ In the Meeks–Dashiell litigation, the parties were represented by skilled litigation counsel who made a strategic decision to submit only five excerpts from the divorce action. Counsel for each party could have sought to have the entire court file from the Worcester County divorce action made available to the Wicomico County motion judge, but did not do so. It is not the proper function of an appellate court to override such tactical decisions and seek out additional evidence to supplement the record in order to support better arguments than those that were in fact raised and decided in the circuit court. *Cf. Matthews v. Matthews,* 112 Md. 582, 588–89, 77 A. 249 (1910) ("The proceedings in the first case were not therefore properly before the Court below in this case, and not being in the record, are not before us on this appeal."); *Anderson v. Cecil,* 86 Md. 490, 492, 38 A. 1074 (1897) ("this Court cannot look outside the record for the facts of the case").

Even though this Court has the authority to take judicial notice *nostra sponte* of other court proceedings, we have historically exercised such authority only in exceptional cases to prevent an unjust result, and there is no pressing reason for us to do so under the circumstances of this case. We have been unable to find a case in which either this Court or the Court of Appeals exercised this authority for the purpose of supplementing the record that was before the circuit court when that court denied a motion for summary judgment. Dashiell has not asserted any argument that causes us to fear that a grave injustice will result if we follow our normal

appellate procedures and remand this civil action to the circuit court for further proceedings.

■ In the absence of any compelling circumstances that would support us taking the extraordinary action of making an unguided review of another court's file that was not reviewed by the motion judge, we will leave to litigation counsel and the circuit court the task of analyzing the impact of the Worcester County court records upon Meeks's Wicomico County malpractice claim. The purpose of imposing judicial estoppel to preclude certain claims is to preserve the integrity of the courts. *WinMark, supra,* 345 Md. at 628, 693 A.2d 824. There is no reason for us to distort our normal appellate procedures in this case in the name of preserving the integrity of the court system.

**JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY VACATED. CASE REMANDED FOR FURTHER PROCEEDINGS. APPELLEES TO PAY THE COSTS.**

Dissenting Opinion by DEBORAH S. EYLER, J., in which MURPHY, C.J., SALMON, JAMES R. EYLER, and KRAUSER, JJ., join.

I respectfully dissent. In my view, the summary judgment in favor of Dashiell and Hearne & Bailey, P.A., in the legal malpractice case should be affirmed on the ground of judicial estoppel.

In Meeks's legal malpractice action against Dashiell and his law firm ("Dashiell"), he alleged negligence in the preparation of a prenuptial agreement in 1989. Dashiell moved to dismiss or for summary judgment, on two grounds: statute of limitations and judicial estoppel. The circuit court granted summary judgment in favor of Dashiell on the ground of limitations. Meeks noted an appeal, asking whether the court erred.

The case was argued before a three-judge panel of this Court. Thereafter, it was set in for *en banc* review, due to the important issues it raises. As I shall discuss in greater detail

below, after the *en banc* argument, this Court, on its own motion, directed that the record in the 2002–2003 divorce case between the Meekses in the Circuit Court for Worcester County be delivered to this Court; and that the record include transcripts of a hearing in the divorce case on a motion that had been filed by Meeks to enforce the prenuptial agreement. The Court also gave the parties an opportunity to submit supplemental briefs, which they did.

## FACTS AND PROCEEDINGS

### *Overview*

This case stems from the unraveling domestic situation of Meeks and his now ex-wife, Melanie Davis Meeks ("Davis"). The two were married on November 4, 1989, when Meeks was 24 and Davis was 23. The day before their wedding, they signed a prenuptial agreement. The agreement was drafted by Dashiell, who represented Meeks. Davis was represented by Walter ("Bud") Anderson, Esquire, who is since deceased.

Davis had a young child, Kaitlind, from a previous marriage. After she and Meeks married, Meeks adopted the child. Meeks and Davis went on to have two more children.

On May 10, 2001, Meeks and Davis separated. On February 7, 2002, Meeks filed a complaint for limited divorce in the Circuit Court for Worcester County. Davis filed a counter-complaint. Eventually, they both filed amended complaints for absolute divorce.

Meeks filed a motion to enforce the prenuptial agreement. Davis opposed the motion. On October 28, 2002, the court held an evidentiary hearing on the motion. It ruled in Meeks's favor, finding that the agreement was valid and enforceable.

A month later, on November 26, 2002, the parties and counsel appeared before a domestic relations master and read the terms of a settlement into the record. The terms included that Meeks would pay Davis nonmodifiable, fixed-term alimony of $6,000 per month for eight years. The parties were

questioned by their lawyers and each acknowledged entering into the agreement voluntarily and knowingly.

The lawyers were supposed to cooperate in putting the agreement into writing. They disagreed about the language to be used. Meeks filed a motion to enforce the settlement agreement, which Davis opposed. Ultimately, the language disagreement was resolved and a final written settlement agreement was prepared and signed on May 21, 2003. The settlement agreement in final form called for the same non-modifiable, fixed-term alimony payment as put on the record before the domestic relations master.[3] The parties expressly acknowledged that they were entering into the agreement freely and voluntarily with the intention of fully settling and determining their rights and obligations pertinent to their marriage.

The settlement agreement was incorporated into the court's final divorce decree, which was issued on June 11, 2003.[4]

A few months later, on October 24, 2003, Meeks sued Dashiell for legal malpractice, in the Circuit Court for Wicomico County. He alleged that he had retained Dashiell to prepare a prenuptial agreement; that Dashiell had given him a draft prenuptial agreement that included a waiver of alimony clause; that he (Meeks) signed the agreement very soon thereafter; and that Dashiell failed to inform him that the final draft he was signing was different from the initial draft in that it no longer included a waiver of alimony clause. He further alleged that, only after he and Davis separated in May of 2001—and he sought legal advice about a divorce—did he learn that the prenuptial agreement as signed did not include a waiver of alimony clause.

---

3. The settlement agreement stated that Meeks would pay Davis $6,000 per month in alimony, to terminate upon the first to occur of the following: "(1) death of [Davis]; (2) death of [Meeks]; (3) remarriage of [Davis]; or (4) the arrival of February 28, 2010."

4. One week prior, an examiner took testimony; Meeks stated under oath that he and Davis had entered into the settlement agreement and that it "resolve[d] all issues arising out of the marriage."

Meeks claimed that as a result of Dashiell's negligence he was ordered, in the divorce case, to pay alimony to Davis. (He did not state that the divorce case was resolved by a settlement.) He claimed to have been injured in the total amount of alimony he was "ordered" to pay by the Circuit Court for Worcester County, and sought damages against Dashiell in that amount.

Ultimately, the circuit court granted summary judgment in favor of Dashiell, on the ground that his malpractice claim was time-barred.

### Pertinent Details in the Divorce Case

The record in the divorce case shows as follows:

In his complaint and amended complaint in the divorce case, Meeks asked the court to award Davis rehabilitative alimony. He then filed a motion to enforce the prenuptial agreement. He did not allege in his motion that any part of the agreement did not reflect the parties' intentions or that the agreement did not embody the parties' complete understanding. Specifically, he did not allege that the parties had agreed to waive their right to seek alimony but that a provision to that effect was omitted, improperly, from the agreement as ultimately signed.

In opposing the motion, Davis argued that Meeks did not fully, frankly, and truthfully disclose his real and personal property and that there was unfairness and inequity in the procurement of the agreement, as she did not freely and voluntarily enter into it.

The primary witnesses at the evidentiary hearing on the motion to enforce in the divorce case were Meeks, Davis, and Dashiell, whose testimony was submitted by deposition. The important exhibits introduced into evidence were a draft prenuptial agreement, undated; the final agreement, as signed on November 3, 1989; and Dashiell's file.

In opening statement, Meeks's lawyer argued that the final agreement was a "negotiated agreement," reached pursuant to full disclosure of each parties' assets, and entered into freely

and fairly by both parties, upon the advice of counsel. Davis's lawyer argued that the agreement was presented to Davis at the last minute, two days before a wedding that had been long planned; that she signed it only to please Meeks and avoid the humiliation of having her wedding cancelled at the last moment; and that she did so without knowledge of Meeks's assets or an understanding of what the agreement meant.

The draft agreement and the final agreement differ in two substantive respects. First, the draft agreement, at paragraph 3, states that "it is the intention of the parties that all rights in property, real and personal, acquired during their marriage, shall be governed by title, and that nothing shall be deemed to be 'marital property'. . . ." The final agreement adds to that sentence: "except that property expressly titled as tenants by the entireties shall be declared to be 'marital property.' " Thus, the final agreement makes tenants by the entireties property marital property. Second, the draft agreement contains, at paragraph 5, a waiver of alimony clause. That clause is not in the final agreement.

Meeks testified that he and Davis lived together before they were married. Sometime around May 1989, after they became engaged, he raised the issue of a prenuptial agreement. Davis did not object. In late September of 1989, he contacted Dashiell about representation on three issues: a prenuptial agreement, estate planning, and a power of attorney. At some later time, Dashiell also represented both Meeks and Davis in the adoption proceeding for Kaitlind.

According to Meeks, about a month before the wedding, he again told Davis that he wanted a prenuptial agreement. He explained that he wanted the agreement to protect his family's business, Delaware Elevator, for his children. He then recontacted Dashiell and told him to draft the agreement.

Thereafter, on a date Meeks does not recall, he and Davis met with Dashiell, who presented a draft prenuptial agreement. Dashiell told Davis she would need to get her own lawyer to review the agreement and advise her. Davis told

Meeks she was going to have her family's lawyer, Bud Anderson, do so.

On direct examination, Meeks was shown the draft agreement and identified it as such. The colloquy between him and his lawyer proceeded as follows:

Q: In regard to that antenuptial agreement, Mr. Meeks, would you go to, in the draft, paragraph 5? In the final signed agreement, is this paragraph regarding alimony still in the agreement?

A: No, the waiver of alimony was removed.

Q: So, at this point, based on the signed agreement, Mrs. Meeks has retained her right to claim alimony; is that correct?

A: Yes, that's correct.

Meeks then testified that he attended the signing of the final agreement with Davis, Dashiell, and Dashiell's assistant, who witnessed and notarized the signatures. No questions were asked. He and Davis simply signed the document and left.

Meeks did not mention at any point in his testimony that, when he signed the final agreement, he did not know that the waiver of alimony clause had been removed, or that any revisions had been made to it from the draft agreement. He did not say anything to suggest that he did not know that there was a draft agreement and then a final agreement. Nor did he say anything to suggest that the final agreement was incomplete or did not memorialize all of the terms to which the parties actually had agreed.

Davis testified that she and Meeks met with Dashiell on November 2, 1989, and he presented them with a draft prenuptial agreement. Her father suggested she meet with Anderson. She met with Anderson, who looked over the agreement and told her not to sign it. She then returned to Dashiell's office and told him that Anderson had said it would not be in her best interest to sign the agreement, and that she was not going to sign the agreement until it was rewritten to be "a little more palatable" for her. She told Dashiell she had been instructed not to sign the agreement. She knew at that

point that the agreement would have to be redrafted and that something would have to be done to it for her to sign it.

That night, at home, Davis talked to Meeks about the agreement. He said he wanted it to protect the inheritance he had received from his father (who had died in 1986) and to protect his mother and his aunt in the event of his death.

According to Davis, she then had a second meeting with Anderson. He told her revisions had been made to the agreement. He no longer was telling her not to sign it. As Davis put it, "Well, he [Anderson] sort of had changed his tune and he wasn't declaring no, absolutely do not sign this, and I had taken the, this was the second draft, I knew that there had been some revisions made." She added that "he did not tell me not to sign it."

Dashiell testified that he drafted both the draft and final prenuptial agreements. He presented the draft agreement to Meeks and Davis, and told Davis she needed to get her own lawyer to review it. He testified that he knew he had spoken to Anderson about the agreement and that there were revisions made. He did not remember the details surrounding the changes that were made to the agreement, however, but he thought they were made at Anderson's request. There is a note in Dashiell's file by his assistant about the change in Paragraph 3, which has the name "Bud" on it. Also, there is a bracket drawn next to Paragraph 5 in the initial draft; Dashiell testified he would have drawn the bracket, and the bracket meant that that language was to be deleted. The most he could say about the details surrounding the changes to the agreement was, "It is my recollection that Mr. Anderson contacted me, was either by phone or in the office, and requested a modification to the agreement, and his request resulted in a change to the agreement."

Dashiell was not asked any questions about what he had told Meeks about the changes to the agreement.

In closing argument, Meeks's lawyer emphasized Davis's testimony about her second meeting with Anderson. She argued that, after Davis's first meeting with Anderson, it was

clear that the agreement was not acceptable to her and that it had to be made "more palatable" for her to sign it. Then, two significant changes were made to the agreement: tenants by the entireties property was made marital property and the alimony waiver was eliminated. These changes benefitted Davis. As Meeks's lawyer put it, "So I think we have to conclude that this was a negotiated agreement."

Davis's lawyer argued that Davis entered into the agreement under pressure. During the argument, the court commented that there was evidence that Anderson at first told Davis not to sign the agreement and then, when she met with him a second time to review a revised agreement, he "changed his tune." She then signed it.

The court ruled that the agreement would be enforced. It found that there was no question but that full disclosure of assets was made. (That issue had faded into the background as the hearing progressed.) The court further found that Davis had entered into the agreement freely and voluntarily; that is, she had had the opportunity to obtain counsel and in fact received the advice of counsel and acted on it. *"[At] first she was told [by her lawyer] not to [sign] and then [the agreement] was, it was altered and at one point the testimony is that the advice [of her counsel] changed. So for that reason I'll find it a valid agreement."* (Emphasis added.)

### Pertinent Details in the Legal Malpractice Case

As noted above, Meeks alleged that Dashiell breached the standard of care by failing to tell him that the prenuptial agreement had been changed to eliminate the alimony waiver clause.

Before any discovery was undertaken, Dashiell moved to dismiss or for summary judgment and requested a hearing. In his supporting memorandum of law, he argued, *inter alia*, that the claim was barred by the doctrine of judicial estoppel.[5]

---

5. Dashiell also argued that the claim was barred by the statute of limitations or, in the alternative, that Meeks had failed to show Dashiell's negligence proximately caused his damages.

Dashiell maintained that Meeks's affirmative request in the divorce case that Davis be awarded rehabilitative alimony was inconsistent with his position in the malpractice case that Davis was not entitled to any alimony; and that Meeks's motion to enforce the prenuptial agreement in the divorce case, in which he represented that the agreement was the full and final one between the parties, was inconsistent with his position in the malpractice case that he had "never agreed to execute the agreement without a waiver of alimony provision." [6]

Meeks filed a timely response. Regarding judicial estoppel, he argued that his prior representations to the divorce court were not inconsistent with his allegations in the malpractice case. He said his request that Davis be awarded rehabilitative alimony was a "legal stratagem" undertaken to "minimize any award" of alimony to Davis after he discovered that Dashiell had not included the waiver of alimony provision in the agreement; that is, it was an effort to mitigate damages. He further responded that the purpose of his filing a motion to enforce the prenuptial agreement in the divorce case was to "resolve disputes that had arisen over the disposition of assets and real estate between [he] and [Davis]," and that the motion did not purport to resolve "issues related to alimony."

Meeks supported his opposition with an affidavit, which stated:

In 1989, prior to my marriage to my wife, Melanie ..., I met with my attorney, [Dashiell], and we reviewed a draft of the antenuptial agreement which contained a waiver of alimony provision.

On November 3, 1989, I executed the antenuptial agreement presented to me by ... Dashiell.

*I was not made aware of any negotiations that occurred between the time that I reviewed the draft of the antenuptial*

---

6. In support of these arguments, Dashiell attached copies of Meeks's complaint for divorce, his motion to enforce the prenuptial agreement, and docket entries showing, *inter alia*, the court's ruling granting his motion to enforce the agreement.

*agreement and the execution of the final agreement that related to alimony.*

> *Prior to executing the antenuptial agreement, I was not advised by my attorney ... or any other individual employed by Hearne and Bailey, P.A., that the waiver of alimony provision had been removed from the agreement. I first discovered the waiver of alimony provision was not in the executed antenuptial agreement when I consulted with an attorney in 2001 regarding a divorce from my wife ...*

The inclusion of the rehabilitative alimony clause in the Complaint for Divorce filed on my behalf was an attempt to mitigate any alimony award given to my wife ... I had no interest and gained no benefit in having an alimony award granted to my estranged wife.

(Emphasis added.)

After arguing that his positions in the divorce and malpractice cases were not inconsistent, Meeks went on to assert that, in the final analysis, he did not benefit from his "legal stratagem" of asking the court to award Davis rehabilitative alimony. Without any citation to any record, he stated that, in the divorce case, "[a] divorce hearing was conducted at which time [Davis] was awarded $6,000 per month to be paid for eight years ($576,000)" and the divorce court "granted [Davis] $576,000 in alimony [and] [c]learly was not persuaded by [Meeks] that [Davis] should only be awarded minimal rehabilitative alimony."

The court held a hearing on the motion on April 27, 2004. Following argument of counsel, it granted summary judgment in favor of Dashiell, on the ground that Meeks's malpractice claim was barred by the statute of limitations. The court stated that it was not granting summary judgment on the ground of judicial estoppel.

Meeks noted a timely appeal.

## STANDARD OF REVIEW

### *Summary Judgment*

A motion for summary judgment may be granted when "there is no genuine dispute as to any material fact and ... the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2–501(e). These are legal questions, and, therefore, the standard of review is "whether the trial court was legally correct." *Converge Servs. Group, LLC v. Curran*, 383 Md. 462, 476, 860 A.2d 871 (2004) (quoting *Sadler v. Dimensions Healthcare Corp.*, 378 Md. 509, 533, 836 A.2d 655 (2003)).

Ordinarily, this Court reviews a grant of summary judgment only on the grounds relied upon by the trial court. *See* Md. Rule 8–131(a); *Hagerstown Elderly Assocs. Ltd. P'ship v. Hagerstown Elderly Building Assocs. Ltd. P'ship*, 368 Md. 351, 366 n. 6, 793 A.2d 579 (2002); *Blades v. Woods*, 338 Md. 475, 478, 659 A.2d 872 (1995). However, when an " 'alternative ground is one upon which the circuit court would have had no discretion to deny summary judgment,' " this Court may affirm a grant of summary judgment for " 'a reason not relied on by the trial court.' " *Vogel v. Touhey*, 151 Md.App. 682, 706, 828 A.2d 268 (2003) (quoting *Ragin v. Porter Hayden Co.*, 133 Md.App. 116, 134, 754 A.2d 503 (2000)).

Here, the trial court granted summary judgment on the ground of limitations and denied summary judgment on the ground of judicial estoppel. Because, as I shall explain, that doctrine is designed to protect the integrity and dignity of the judicial process, this Court may raise and decide the issue *nostra sponte*. *Eagan v. Calhoun*, 347 Md. 72, 88, 698 A.2d 1097 (1997) (holding *sua sponte* that a party's defense was barred by judicial estoppel); *Gordon v. Posner*, 142 Md.App. 399, 424, 790 A.2d 675 (2002)(citing *Eagan, supra*, and addressing and deciding judicial estoppel issue that was not decided by the trial court on summary judgment). *See Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524, 530 (5th Cir.2000) (commenting that because the doctrine of judicial estoppel protects the judicial system, it can be applied *sua*

*sponte* in certain instances); *United States for Use of Am. Bank v. C.I.T. Constr. Inc. of Tex.,* 944 F.2d 253, 258 (5th Cir.1991)(pointing out that "recent decisions do indicate that an appellate court can raise the doctrine of judicial estoppel on its own motion"); *see also New Hampshire v. Maine,* 532 U.S. 742, 750, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (noting in case brought under original jurisdiction of the Supreme Court that because judicial estoppel is intended to prevent "improper use of judicial machinery," it is an "equitable doctrine invoked by a court at its discretion") (quoting *Konstantinidis v. Chen,* 626 F.2d 933, 938 (D.C.Cir.1980) and *Russell v. Rolfs,* 893 F.2d 1033, 1037 (9th Cir.1990)).

### *Consideration of the Record in the Divorce Case*

On appeal, Meeks represented to this Court, as he had to the court below, that the divorce case had gone to a hearing on the merits, at the conclusion of which the court ordered him to pay alimony of $6,000 per month for eight years. He asserted that he had been ordered to pay that amount of alimony as a consequence of Dashiell's negligence.

Contrary to Meeks's assertions, the docket entries for the divorce case, which are part of the record in the legal malpractice case, do *not* reflect that the court held a hearing on the merits or that it issued an order determining that the appellant was to pay alimony and setting the amount. The docket entries show that the parties appeared before a master and put a settlement on the record; that several months later, a second amended complaint was filed with an attached "Marital Settlement Agreement"; and that on the same day, an answer was filed and a Judgment of Absolute Divorce was entered.

The filings in the circuit court and in this Court by Dashiell did not clarify the apparent discrepancy between Meeks's assertions and the docket entries. How the divorce case was resolved is material to the issue of judicial estoppel. For that reason, on July 5, 2000, this Court issued an Order that stated, in preface, that "[f]rom the briefs filed and the arguments heard, it appears to the Court of Special Appeals, sitting *in banc,* that the Questions Presented may be materially affected

by the record [in the divorce case] which is not presently a part of the record in this Court." The Order directed the Clerk's Office in the Circuit Court for Worcester County to transmit the entire record in the divorce case; directed the appellant's counsel to "supplement the record in this Court with a transcript" of the evidentiary hearing on the motion to enforce the prenuptial agreement; and permitted the parties to file supplemental memoranda and replies.

The record, when received, disclosed that there was no hearing on the merits in the divorce case. The circuit court in that case did not decide the issues of whether Davis would receive alimony and the amount of alimony. On the contrary, after the court enforced the prenuptial agreement, Meeks and Davis settled the divorce case by entering into an agreement in which Meeks promised, voluntarily, to pay alimony of $6,000 per month for eight years. Until the record of the divorce case was received by this Court, Meeks had not mentioned to this Court or to the circuit court that the issue of alimony had been resolved by a settlement.

As I shall discuss below, it is apparent from the evidence, arguments, and ruling at the evidentiary hearing on the motion to enforce the prenuptial agreement that Meeks's position with the court in the divorce case and his position with the court in this legal malpractice case are clearly inconsistent, and that he is attempting to take improper advantage of the legal system to his own benefit. Even if the issue of judicial estoppel never had been raised below, under the authorities cited above, this Court may raise and decide it *nostra sponte.* By parity of reasoning, it makes little sense for this Court to address the issue of judicial estoppel by limiting its review to the information that was before the circuit court.

The majority maintains that it is not proper for this Court to review the full record of the divorce case, because it was not put before the court below, it is not our everyday practice to take judicial notice of other court proceedings, and there are

no compelling circumstances to review another court's record. I disagree.

While it is the general rule that a court will not take judicial notice of proceedings in another case, unless they are put in evidence, "in exceptional cases, as high authority show, the dictates of logic will yield to the demands of justice, and the courts, in order to reach a just result, will make use of established and uncontroverted facts not formally of record in the pending litigation." *Fletcher v. Flournoy*, 198 Md. 53, 61, 81 A.2d 232 (1951)(superseded by rule on other grounds). *See also Calhoun v. State*, 297 Md. 563, 656 n. 8, 468 A.2d 45 (1983)(in dissent); *Daniel v. Kensington Homes, Inc.*, 232 Md. 1, 5, 192 A.2d 114 (1963); *Forward v. McNeily*, 148 Md.App. 290, 309, 811 A.2d 855 (2002); *Lerner v. Lerner*, 132 Md.App. 32, 750 A.2d 709 (2000); *Landover Assoc. v. Fabricated Steel*, 35 Md.App. 673, 681–82, 371 A.2d 1140 (1977); *James v. State*, 31 Md.App. 666, 685, 358 A.2d 595 (1976); *White v. Harris*, 23 F.Supp.2d 611 n. 2 (D.Md.1998).

This is an exceptional case in which the demands of justice permit this Court to take judicial notice of the record of the divorce case. First, the two cases are closely related; the disposition of the divorce case is the entire basis for the damages claim in the legal malpractice case. Indeed, the divorce case is the subject matter of the legal malpractice case. Also, the alleged inconsistency in the positions Meeks took in the two cases is the basis for the judicial estoppel argument raised and decided below.

Second, the facts as to what was said and done by Meeks and by the court in the divorce case are not reasonably in dispute and will not change. While the divorce case, especially the facts surrounding the execution of the prenuptial agreement, may have been hotly contested, the positions the parties took in the case, and the ruling of the court enforcing the agreement, are established and are not subject to debate at this point.

Finally, the appellant made representations about the record in the divorce case that required clarification, prompting

this Court to obtain the record; and the representations turned out to be inaccurate. It is a colossal waste of judicial time for this Court to consider the issue of judicial estoppel on the incomplete and misleading record that was before the circuit court, especially given that judicial estoppel is an issue the Court can raise and decide on its own, as it concerns the integrity of the legal system.

## DISCUSSION

### *Judicial Estoppel*

*Kramer v. Globe Brewing Co.,* 175 Md. 461, 2 A.2d 634 (1938), is the seminal case in Maryland adopting the doctrine of judicial estoppel. There, the Court held that an employer defendant who, in an automobile tort case, had prevailed on the position that the plaintiff, a passenger in the employer's delivery truck, was an employee whose only remedy was workers' compensation, could not later, in a workers' compensation case, take the position that the plaintiff was not an employee. The Court admonished that parties cannot play "fast and loose" with the judicial system by advancing inconsistent positions:

> If parties in court were permitted to assume inconsistent positions in the trial of their causes, the usefulness of courts of justice would in most cases be paralyzed; the coercive process of the law, available only between those who consented to its exercise, could be set at naught by all. But the rights of all men, honest and dishonest, are in the keeping of the courts, and consistency of proceeding is therefore required of all those who come or are brought before them. It may accordingly be laid down as a broad proposition that one who, without mistake induced by the opposite party, has taken a particular position deliberately in the course of litigation, must act consistently with it; one cannot play fast and loose.

*Id.* (quoting *Bigelow on Estoppel* 783 (6th ed.) and citing *Ohio & Miss. Ry. v. McCarthy,* 96 U.S. 258, 267–68, 24 L.Ed. 693 (1877) ("Where a party gives a reason for his conduct and

decision touching any thing involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration.")).

Likewise, in *Stone v. Stone,* 230 Md. 248, 186 A.2d 590 (1962), the Court of Appeals observed:

Generally speaking, a party will not be permitted to occupy inconsistent positions or to take a position in regard to a matter which is directly contrary to, or inconsistent with, one previously assumed by him, at least where he had, or was chargeable with, full knowledge of the facts and another will be prejudiced by his action.

*Id.* at 253, 186 A.2d 590 (applying 19 Am.Jur. *Estoppel,* § 50 (1939)). There, the Court held that a widower who, in the probate of his wife's estate, took the position that certain securities were part of the corpus of a trust, could not, in an action for the distribution of those securities upon termination of the trust, take the position that the securities were his own property.

In *WinMark Ltd. P'ship v. Miles & Stockbridge,* 345 Md. 614, 693 A.2d 824 (1997), the Court noted that the policy underlying judicial estoppel is not to "protect[ ] the parties [to the litigation] nor [is it to] punish[ ] the wrongdoer." *Id.* at 628, 693 A.2d 824. Rather, it is to "protect the courts from having to endorse or reward inequitable conduct." *Id.* In that complicated case, the Court held that a partnership that did not include a potential legal malpractice claim as an asset of its bankruptcy estate was not judicially estopped to pursue the claim against a law firm, which was not a creditor in the bankruptcy. Recognizing that not only the partnership and the law firm, but also the partnership's secured and unsecured creditors, had competing interests, the Court held that the doctrine did not apply.

Finally, in *Eagan v. Calhoun, supra,* 347 Md. 72, 698 A.2d 1097, the Court of Appeals held that the doctrine of judicial estoppel prevented a husband, who had killed his wife, from defending a wrongful death suit brought against him by their children on the ground that the killing was not intentional,

when he had conceded in a prior guardianship proceeding that the killing *was* intentional.

While *Eagan* is the last word on judicial estoppel from the Court of Appeals,[7] the Supreme Court has since written on the issue in *New Hampshire, supra,* 532 U.S. 742, 121 S.Ct. 1808, 149 L.Ed.2d 968. In that case, New Hampshire invoked the original jurisdiction of the Supreme Court by bringing an action against Maine to establish New Hampshire's boundary with Maine as being along the shore of Maine. Maine moved to dismiss the case on the ground of judicial estoppel, arguing that the boundary line already had been affixed as in the middle of the Piscataqua River, which runs between the two states, as determined by the Supreme Court in a 1977 consent judgment entered in a previous boundary dispute between the states.

The Court observed that while it had not had occasion to discuss the doctrine of judicial estoppel in depth, other courts had "uniformly recognized that its purpose is 'to protect the integrity of the judicial process.' " 532 U.S. at 749, 121 S.Ct. 1808 (quoting *Edwards v. Aetna Life Ins. Co.,* 690 F.2d 595, 598 (6th Cir.1982)). Noting that " 'the circumstances under which judicial estoppel may be appropriately invoked are probably not reducible to any general formulation of principle,' " *id.* at 750, 121 S.Ct. 1808 (quoting *Allen v. Zurich Ins. Co.,* 667 F.2d 1162, 1166 (4th Cir.1982)), the Court pointed to three factors that typically inform the decision of whether to apply the doctrine in a particular case:

First, a party's later position must be "clearly inconsistent" with its earlier position. Second, courts regularly inquire

---

7. The Court of Appeals did mention in *Pittman v. Atl. Realty Co.,* 359 Md. 513, 754 A.2d 1030 (2000), that, in the Fourth Circuit, the application of judicial estoppel requires the following: "(1) the assertion of a factual 'position inconsistent with that taken in prior litigation'; (2) that the 'prior inconsistent position must have been accepted by the court'; and (3) that 'the party sought to be estopped must intentionally have misled the court to gain unfair advantage.' " *Id.* at 529 n. 9, 754 A.2d 1030 (quoting *Sedlack v. Braswell Servs. Group, Inc.,* 134 F.3d 219, 224 (4th Cir.1998)).

whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that the first or the second court was misled." Absent success in a prior proceeding, a party's later inconsistent position introduces no "risk of inconsistent court determinations," and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id.* at 750–51, 121 S.Ct. 1808 (internal citations omitted).

The Court further noted that "[a]dditional considerations may inform the doctrine's application in specific factual contexts," but that in the instant case, the doctrine of judicial estoppel barred New Hampshire's claim. *Id.* at 751, 121 S.Ct. 1808. It reasoned:

[T]he record of the 1970's dispute makes clear that this Court accepted New Hampshire's agreement with Maine that "Middle of the River" means middle of the main navigable channel, and that New Hampshire benefitted from that interpretation.... Although New Hampshire now suggests that it "compromised in Maine's favor" on the definition of "Middle of the River" in the 1970's litigation, that "compromise" enabled New Hampshire to settle the case on terms beneficial to both States. Notably, in their joint motion for entry of the consent decree, *New Hampshire and Maine represented to this Court that the proposed judgment was "in the best interest of each State."* Relying on that representation, the Court accepted the boundary proposed by the two States.

*Id.* at 752, 121 S.Ct. 1808 (emphasis added) (internal citations omitted).

This Court has applied judicial estoppel in several cases, both before and after *New Hampshire* was decided. *See, e.g., Abrams v. Am. Tennis Courts,* 160 Md.App. 213, 226–27, 862 A.2d 1094 (2004) (holding that employee who took the position

in a workers' compensation case that he injured himself in a fall at work was judicially estopped to claim in tort action against the employer that the injuries actually happened when he was struck by a vehicle driven by a co-employee); *Vogel, supra*, 151 Md.App. at 722, 828 A.2d 268 (holding that former client who took the position in her divorce case that the settlement she entered into was fair and reasonable, knowing that her lawyer had not properly reviewed documents important to assessing the terms of the settlement, and having had an opportunity to withdraw from the settlement, was estopped to pursue a legal malpractice action against her lawyer for not properly assessing the case for settlement); *Mathews v. Gary,* 133 Md.App. 570, 580, 758 A.2d 1019 (2000), *aff'd on other grounds,* 366 Md. 660, 785 A.2d 708 (2001) (holding that injured motorist who, in her personal injury action against the tortfeasor, took the position that her back surgery was necessary was judicially estopped to sue her surgeons for malpractice upon allegation that the surgery was unnecessary); *Wilson v. Stanbury,* 118 Md.App. 209, 215–17, 702 A.2d 436 (1997) (holding that a motorist who filed suit against the driver of another car, knowing that he was not negligent but wanting to obtain a settlement from his insurance company, was judicially estopped to sue his former attorney for malpractice for not filing an action against a third driver—whom the motorist *knew* was negligent—within the limitations period).

This Court has held the doctrine of judicial estoppel not applicable when one or more of the factors discussed in *New Hampshire v. Maine* was absent. *See Middlebrook Tech, LLC v. Moore,* 157 Md.App. 40, 63–65, 849 A.2d 63 (2004) (holding that, because court in first case did not decide whether lease had automatically terminated, lessee was not judicially estopped to take the position in a subsequent case that the lease had not automatically terminated); *Gordon, supra,* 142 Md.App. at 432–33, 790 A.2d 675 (holding that, because court in first case did not accept a party's assertion, he was not judicially estopped to make an inconsistent assertion in a second case); *Roane v. Wash. County Hosp.,* 137 Md.App. 582, 593, 769 A.2d 263 (2001) (holding that, because

plaintiffs did not rely on the defendants' argument that a forum selection clause mandated bringing the suit in state court, the plaintiffs did not suffer a detriment, and the defendants were therefore not judicially estopped to later challenge the jurisdiction of the court).

## *Analysis*

### *1. Inconsistency*

The threshold question in a judicial estoppel analysis is whether the position taken by the party in the first case is clearly inconsistent with his position in the second case. Here, Dashiell argues that, in the divorce case, Meeks took the position that the signed agreement was valid and enforceable, representing the parties' final agreement and controlling the disposition of the property issues in the case; but that in the malpractice case, he is taking the contrary and inconsistent position that the agreement as signed does not embody the parties' final agreement, in that the parties also had agreed that they would waive the right to alimony.

Meeks responds that his position in the divorce case is not inconsistent with his position in the malpractice case:

> It was his position [in the divorce case] that, as a result of the omission of the waiver of alimony [by Dashiell], that he had no alimony shield—and was therefore most likely obligated to pay alimony. His position [in the malpractice case] is that [the] omission of the waiver of alimony rendered him liable for alimony.

He further argues that, in the divorce case, his lawyer simply "was seek[ing] to enforce what remained of the agreement."

In my view, the position that Meeks advanced in the divorce case with respect to the prenuptial agreement is clearly inconsistent with the position he is taking in the malpractice case.

In the divorce case, Meeks sought to have the court enforce the final, signed prenuptial agreement. His lawyer expressly advocated the position that the parties signed the agreement in that form and that it was binding on them. Implicitly, she

advocated the position that the agreement embodied the entire understanding of the parties. No judge hearing the testimony at the evidentiary hearing on the motion to enforce, including Meeks's testimony, would have thought there was agreed-upon language that was omitted from the final written agreement.

Now, in the malpractice case, Meeks is taking the contrary position: that the final signed agreement *does not* embody the entire understanding of the parties. His position in the malpractice case is that, in addition to what was written and signed, the parties also agreed that they would waive their respective rights to alimony; but, due to Dashiell's negligence, the final agreement did not include such a waiver. Thus, Meeks's positions in the two cases about whether the final written agreement was the parties' full agreement are inconsistent.

In addition, and perhaps more importantly, Meeks is taking flatly inconsistent positions in the two cases about how the final agreement came to be in the form it is. In the divorce case, his argument on the issue of unfairness was that the agreement was not unfair, or the product of overreaching, because it was negotiated. Specifically, he argued that the agreement was changed, from its draft form to its final signed form, because Davis was refusing to sign it in its draft form; and that one change that resulted in Davis's becoming willing to sign the agreement was the removal of the alimony waiver clause. Thus, a change to the agreement that Meeks argued in the divorce case showed that the final agreement was the result of negotiation, and therefore was fair, is a change he now contends, in the malpractice case, was not supposed to have been made and was made without his knowledge. These positions are mutually exclusive and therefore clearly inconsistent.

As noted above, one of the purposes of the doctrine of judicial estoppel is to prevent parties from "blowing hot and cold," that is, taking contrary positions in cases when doing so serves their interests. How Meeks's interest was served by taking the position he did in the divorce case, and how he is

attempting to serve his interest by taking an inconsistent position in the malpractice case, is best understood in the context of the Maryland law on the validity and enforcement of prenuptial agreements.

Maryland case law does not treat prenuptial agreements as ordinary contracts. The Court of Appeals recently reviewed and reiterated the law governing such agreements in *Cannon v. Cannon,* 384 Md. 537, 865 A.2d 563 (2005). When marriage is the consideration for an agreement—which it is for a prenuptial agreement—the parties are in a confidential relationship as a matter of law. *Id.* at 570, 865 A.2d 563. The party seeking to enforce the agreement can rebut that presumption by showing that a negotiation, *i.e.,* "an actual give and take occurrence," took place between the parties. *Id.* at 752, 865 A.2d 563. If the presumption is rebutted, the parties are treated as equals in contract, and the party attacking the agreement can do so only on the grounds of common-law contract defenses, such as fraud, duress, coercion, mistake, undue influence, and incompetency. *See id.* at 574, 865 A.2d 563.

When the presumption of a confidential relationship is not rebutted, the standard for determining the validity of a prenuptial agreement is whether there was "overreaching, that is, whether in the atmosphere and environment of the confidential relationship, there was unfairness or inequity in the result of the agreement or in its procurement." *Cannon, supra,* 384 Md. at 559, 865 A.2d 563 (quoting *Hartz v. Hartz,* 248 Md. 47, 57, 234 A.2d 865 (1967)); *see also Frey v. Frey,* 298 Md. 552, 563, 471 A.2d 705 (1984). The party seeking to enforce the agreement can do so by showing that full and frank disclosures were made or that the agreement "was not unfairly disproportionate to the attacking party at the time the agreement was entered." *Cannon, supra,* 384 Md. at 559, 574, 865 A.2d 563. "[F]or example, an antenuptial agreement that provides valuable consideration (other than the marriage itself) in exchange for a waiver, or where the parties agree to a mutual waiver of the marital rights, is more likely not to be

found unfairly disproportionate." *Id.* The Court in *Cannon* explained:

> If the analysis of the allowance versus waiver provisions of an antenuptial agreement results in a determination that the terms are unfairly disproportionate as to the party challenging the agreement, the enforcing party must show that overreaching did not occur. On this point, but not meant as an exhaustive list of factors, the trial court may consider such factors as the extent of the disclosure (if any), whether the attacking party had the opportunity to seek legal advice before signing the agreement, and whether the attacking party voluntarily and knowingly relinquished his or her rights.

*Id.*

The final agreement, as moved into evidence, was valuable to Meeks because, if enforced, it would ensure that substantial property in his name, including his interest in Delaware Elevator, was not marital property subject to equitable distribution. By taking the position in the divorce case that the final agreement embodied the parties' full agreement and was reached by a negotiation process in which the alimony waiver was intentionally removed, Meeks increased the likelihood that the court would enforce the agreement. The negotiations tended to negate the existence of a confidential relationship. Even if there was a confidential relationship, the negotiations showed a lack of overreaching by Meeks. The result of the negotiations—the removal of the alimony waiver clause and the inclusion of tenancy by the entirety property as marital property—tended to show that the agreement was not unfairly disproportionate. Thus, taking the position that the final agreement was the parties' full agreement, and that the alimony waiver clause was negotiated out of the agreement, served Meeks's interest in the divorce case in having the final agreement enforced.

Had Meeks taken the position in the divorce case that he now takes in the malpractice case—that the final agreement does not embody the parties' full agreement and that the

alimony waiver was taken out by mistake, not by negotiation—he would have had a weaker case for enforcement. With the parties before it, the court most certainly would have inquired into whether they in fact had agreed to an alimony waiver provision. If Davis took the position that she had so agreed, the court could have reformed the agreement, on the basis of mutual mistake, to reflect the parties' true intentions. *See Brockmeyer v. Norris*, 177 Md. 466, 473, 10 A.2d 326 (1940)(holding that equity can reform contract based on mutual mistake in reducing transaction to writing). Meeks's enforcement argument would have been weaker, however, because there would have been less evidence of a "give and take" negotiation, and the proportionality evidence would have weighed more significantly in Davis's favor.

In the malpractice case, it no longer is in Meeks's interest to maintain that the final agreement is complete and was reached by negotiation. To prove malpractice, he must show that the final agreement is incomplete because the alimony waiver clause was removed, negligently, by Dashiell. If he succeeds in showing that, he will have obtained the benefits of the agreement as enforced and Davis will continue to receive alimony, but he will not have to use his income to pay the alimony.

There can be no better example of "blowing hot and cold." When it served Meeks's interest to characterize the removal of the alimony waiver as a negotiated change to the agreement that made it fair—a position that increased the likelihood that the divorce court would enforce the agreement—he took that position. Now that it serves his interest to characterize the removal of the alimony waiver as an error that he knew nothing about—a contrary position that would have decreased the likelihood that the divorce court would have enforced the agreement, but if accepted by the malpractice court, will make a third party responsible for paying Meeks's alimony obligation—he takes that inconsistent position. In my view, this Court should not tolerate such an obvious effort to take

advantage of the judicial system by playing one court one way and another court the other way.[8]

Meeks argues, as I have explained, that he simply was pursuing a legal strategy. His inconsistency argument may indeed describe a legal strategy, but it does not accurately describe the position he assumed in the legal proceedings in the divorce case. He did not take the position *with the court* that a waiver of alimony provision was omitted from the agreement, when the parties in fact had agreed to it, and he was therefore most likely going to face an alimony award. He took the *opposite position:* that the final agreement as moved into evidence embodied the parties' full accord, that it was negotiated, and that the waiver of alimony provision in the draft agreement was negotiated out of the final agreement.

This Court's comments in *Mathews, supra,* 133 Md.App. 570, 758 A.2d 1019, are pertinent to Meeks's legal strategy argument. There, in her automobile tort suit, the plaintiff was put on notice before trial that the defendant intended to argue that the surgery the plaintiff underwent was unnecessary. At trial, the plaintiff and her doctor testified that the surgery was necessary. The plaintiff was awarded damages that included medical expenses. She then brought a malpractice claim against her doctor, alleging that the surgery was unnecessary. The doctor moved for summary judgment on the ground of judicial estoppel. The motion was denied, and the case ended in a jury verdict in favor of the plaintiff.

On appeal, this Court reversed, holding that the plaintiff had obtained her verdict in the automobile tort case by taking

---

8. I note with interest that in the malpractice case Meeks alleges that the prenuptial agreement was changed without his knowledge, but he complains only about the change that removed the alimony waiver. He says nothing about the change that made entireties-titled property marital property, likely because it would not benefit him to complain about that change in the same way it benefits him to complain about the alimony waiver change. If he prevails on the alimony waiver change in the malpractice case, he introduces a third party payor into the alimony equation—Davis will continue to receive her alimony, but it will come from Dashiell, and Meeks will retain his income that otherwise would go to pay alimony.

the position that her surgery was necessary, and that she could not then pursue a malpractice claim on the inconsistent ground that the surgery was unnecessary, merely to suit her interests. Speaking for the Court, Chief Judge Murphy stated:

> We recognize that pretrial notice of [the defendant's] "unnecessary surgery" defense placed [Gary] in a difficult position.... *Upon discovery of the "unnecessary surgery" defense, [Gary] was required to consider a number of unpleasant choices. Those choices, however, have consequences. [Gary] chose to argue in [the automobile tort case] that her surgery was necessary. Consequently, she could not thereafter argue in [the malpractice case] that her surgery was unnecessary.*

*Id.* at 580, 758 A.2d 1019 (emphasis added).

Likewise, in the divorce case, Meeks chose to argue that the final agreement as signed was the parties' full, negotiated agreement, with the alimony waiver language being taken out as a concession to Davis. When he made that choice, he knew (according to what he has since said, including in his affidavit in the malpractice case) that the alimony waiver clause was not taken out of the final agreement as a concession to Davis, but was left out of it by mistake. The consequence of Meeks's making the choice to argue as he did at the evidentiary hearing on the motion to enforce, knowing what he knew, is that he cannot now argue that the agreement as signed was not the parties' full agreement and the alimony waiver language was omitted due to Dashiell's negligence. The doctrine of judicial estoppel prevents parties from pursuing inconsistent positions in court as a legal strategy.

Meeks concedes that if he or Dashiell had testified in the divorce case that the waiver of alimony provision of the draft agreement had "been omitted as the result of negotiation, [Dashiell's] estoppel arguments here might have some merit." It was not necessary for Meeks or Dashiell to *testify* for Meeks to have assumed that position, however. The law of judicial estoppel is concerned with the positions a party has

taken in two cases, and a party can take a position without testifying at all. *See, e.g., Eagan, supra,* 347 Md. at 88, 698 A.2d 1097 (basing application of judicial estoppel on position set forth by party's attorney in a memorandum of law filed with the court); *Kramer, supra,* 175 Md. at 470–71, 2 A.2d 634 (holding that party was estopped to assert a position inconsistent with that advanced by the party in pleadings filed in another case). As the transcript of the hearing on the motion to enforce makes plain, Meeks, through his lawyer, took the position that the alimony waiver clause was removed from the draft agreement through negotiation.

Meeks also argues that the positions he has taken in the two cases are not inconsistent because he merely was trying to mitigate his damages. In his view, Dashiell negligently omitted the agreed upon alimony waiver from the final draft, making it incomplete and making it likely that he (Meeks) would have to pay alimony. By taking the tack he did in seeking to have the agreement enforced, he was attempting to salvage the part of the agreement the parties had reached that was in the final draft, so he would not lose the entire benefit of what the parties had agreed to, even though he had lost a part of it. ·

The problem with this mitigation argument is that, once again, it is not the position Meeks took with the court in the divorce case. He did not tell the court that the parties actually had agreed to a waiver of alimony, which would have allowed the court to reform the agreement if indeed that is what the facts in evidence showed. If the court had reformed the agreement, there would have been no loss to mitigate. If the court had found that, consistent with the position Meeks's lawyer was advocating, the parties had not agreed to an alimony waiver and indeed had agreed to remove the alimony waiver clause, Meeks's malpractice case against Dashiell would have been over before it started.

Finally, and relatedly, Meeks's settlement of the divorce case by a comprehensive agreement in which Davis was to receive $576,000 in alimony over an eight-year period also is

inconsistent with the position he is taking in the malpractice case.

The *Vogel* case, *supra*, is instructive. There, this Court held that judicial estoppel barred a wife from pursuing a legal malpractice case against her divorce lawyer. During the divorce case, the husband proposed a property settlement. The wife (a lawyer herself) came to suspect that the husband had not disclosed all his assets, and hired the lawyer to investigate that issue. During discovery, the lawyer received documents about the nature and extent of the husband's assets. He then recommended that the wife settle the case for an amount slightly above the husband's proposed settlement. She followed that recommendation, and the lawyer sent the husband a counteroffer, which he accepted.

A few days later, the wife discovered that the lawyer had failed to review numerous documents he had received about her husband's assets. She fired the lawyer, proceeded *pro se*, and asked the court to enforce the agreement. The court advised her that she did not have to accept the agreement and could undertake additional discovery if she chose. She declined the offer, stating on the record that the agreement was "fair and equitable." 151 Md.App. at 695, 828 A.2d 268. On that basis, the court enforced the agreement.

The wife then sued the lawyer for malpractice, alleging that he had negligently failed to review the documents about the husband's finances and recommended an ill-informed settlement. The lawyer moved to dismiss on the ground of judicial estoppel. The circuit court granted the motion.

This Court affirmed, emphasizing that the wife knew the facts constituting the alleged malpractice before she represented to the court that the agreement was fair and equitable. Judge Hollander, writing for the Court, stated:

> To be sure, when [the wife] agreed to [the lawyer's] recommendation to settle with [her husband] for $50,000, she had not yet discovered that [her husband] had produced the documents in discovery, nor was she aware that [the lawyer] had not reviewed them. *But, by the time [she] fired [the*

*lawyer], and by the time of the divorce hearing a few days later, she had to know what she did not know. She discovered [the lawyer's] alleged dereliction prior to the divorce hearing, and knew by the time of the hearing ... that [the lawyer] had no sound factual basis to support his earlier recommendation to settle ... for $50,000.* Clearly, then, [the wife] knew by the time of the divorce hearing that she was not in a position to make an informed decision as to the settlement, because the information she had hired [the lawyer] to obtain had not yet been analyzed. Yet, despite the fact that [she] knew she had insufficient information as to an appropriate settlement with [her husband], she represented to the [court] that she was "fully aware of the issues" and that the settlement was "fair and equitable."

151 Md.App. at 716, 828 A.2d 268 (emphasis added).

This Court acknowledged that in some cases, "a party is not necessarily estopped from bringing a malpractice action even after deciding voluntarily to settle an underlying suit." *Id.* at 722, 828 A.2d 268 (citing *Thomas v. Bethea,* 351 Md. 513, 522, 718 A.2d 1187 (1998)). In those situations, however, settlement was "a virtual necessity," because the party learned of the attorney's negligence just before the case was scheduled to go to trial. *Id.* The Court explained that *Vogel* was not such a case, as "the court here informed [the wife] that she could pursue additional discovery [and] ... [there was] no indication that the court was forcing [the wife] to trial immediately, or without a lawyer." *Id.*

In the case at bar, Meeks maintains that soon after he and Davis separated and he consulted a divorce lawyer, he learned that there was no alimony waiver clause in the signed prenuptial agreement. All of the allegations he makes against Dashiell in the malpractice case—that the parties had agreed to a waiver of alimony clause, that it was in the initial draft of the agreement, that it was removed from the final draft without his knowledge, and that Dashiell did not inform him it had been removed—were known to him even before he filed the divorce action against Davis. Yet, he did not inform the court about them, and proceeded to argue for enforcement of the

prenuptial agreement on grounds inconsistent with his present allegations. Then, even though he says now that the parties agreed there would be no obligation by either to pay alimony, he entered into a settlement agreement to pay alimony, which he told the master he was accepting freely and voluntarily.

A recent New Jersey case also is enlightening. In *Puder v. Buechel*, 183 N.J. 428, 874 A.2d 534 (2005), a wife in a domestic case accepted a property settlement agreement proposed by her husband upon the recommendation of her lawyer. Before the agreement was memorialized in writing, another lawyer told the wife the settlement was "ridiculously inadequate." *Id.* at 432, 874 A.2d 534. The wife told her lawyer she would not abide by the agreement, fired her, and hired another lawyer. The husband moved to enforce the agreement. In the meantime, the wife filed suit against the first lawyer, alleging that her negligence put her (the wife) in an impossibly weak position in the divorce case, by making it likely that the original agreement would be upheld.

The divorce court held an evidentiary hearing on the motion to enforce. Before the court ruled, the parties entered into a second settlement, the terms of which were read into the record. The wife said she was entering into it voluntarily, but only because she believed the trial court would find the first settlement enforceable and because she felt the settlement would not affect the status of her malpractice case against the first lawyer.

In the malpractice case, the lawyer moved for summary judgment. The court granted the motion on the ground of judicial estoppel. The case eventually made its way to the New Jersey Supreme Court, which affirmed. In that Court, the wife argued that she entered into the second settlement to mitigate the damages she had suffered due to her lawyer's malpractice in recommending the first settlement; and, therefore, her voluntary acceptance of the second settlement did not bar her from pursuing her malpractice claim against her first lawyer.

Rejecting that argument, the court held that "fairness and the public policy favoring settlements dictate that [the wife] is bound by her representation to the trial court that the divorce settlement agreement was 'acceptable' and 'fair.' " 183 N.J. at 437, 874 A.2d 534. The court emphasized that the wife had entered into the second settlement before the trial court had ruled on the motion to enforce and with knowledge of the deficiencies that had led to the first settlement. The court concluded that the second settlement was a failed legal strategy that rested with the wife, not with her former lawyer. Quoting an amicus brief, the court stated, "a client should not be permitted to settle a case for less than it is worth . . . and then seek to recoup the difference in a malpractice action against [the] attorney." *Id.*

Finally, likening the case to another New Jersey domestic case in which the doctrine of judicial estoppel was applied, the court observed:

> [The wife's] knowing and voluntary acceptance of a settlement that she stated was a fair compromise bars her from proceeding with her malpractice claim. [She] entered into the second settlement admittedly aware of the discovery deficiencies leading up to the settlement. . . . [T]o allow [her] to now sue [her first lawyer] for malpractice would afford her the ability to potentially profit from litigation positions that are "clearly inconsistent and uttered to obtain judicial advantage."

183 N.J. at 444, 874 A.2d 534 (quoting *Newell v. Hudson,* 376 N.J.Super. 29, 46, 868 A.2d 1149 (2005)).

Here, knowing (but not disclosing) that he believed Dashiell had committed malpractice in drafting the final prenuptial agreement by omitting an agreed upon alimony waiver, Meeks sought to enforce the agreement on the inconsistent ground that the alimony waiver clause was negotiated out of it. After succeeding in that effort, and still knowing (but still not disclosing) Dashiell's negligence, he entered into a settlement that required him to pay alimony. He represented to the master orally, and then in writing when the settlement was

approved, that he was entering into the agreement voluntarily and knowingly. In the final settlement documents, which were presented to an examiner and to the court, and were incorporated into the court's divorce decree, Meeks represented that the agreement not only was freely and voluntarily made, but was "fair and reasonable" and was not entered into pursuant to fraud or duress.

The facts in this case are the inverse of those in *Puder.* In *Puder,* the wife blamed her former lawyer for the first agreement, which she thought was inadequate and weakened her position in the divorce case. She settled the case before the court determined whether to enforce the first agreement, however, and the court held that she could not then turn around and recover from her lawyer. Here, Meeks thought the prenuptial agreement was inadequate in what it did not include, because of Dashiell's negligence, but sought and succeeded in having the agreement enforced, as if it were the parties' full agreement. Before the court decided whether to grant alimony, Meeks settled the issue by agreement. In both cases, the party who settled and then sued his or her lawyer was representing in the malpractice case the opposite of what he or she was representing in the divorce case.

For all of these reasons, the first prong of the doctrine of judicial estoppel—that the position the party advanced in the first case and his position in the second case are clearly inconsistent—is met.

### 2. Success in the First Case

The second consideration in deciding whether the doctrine of judicial estoppel applies is whether the party sought to be estopped was successful in the position he took in the first case, in that he persuaded the court to accept his position. If the court did not accept that position, judicial integrity would not be threatened if the court in a second case accepted a clearly contrary position. *New Hampshire, supra,* 532 U.S. at 750–51, 121 S.Ct. 1808; *Gordon, supra,* 142 Md.App. at 424, 790 A.2d 675.

Here, Meeks succeeded in persuading the court in the divorce case that the final prenuptial agreement as signed was the parties' full "negotiated agreement," from which an alimony waiver clause had been removed as a concession to Davis, after she had been instructed by her lawyer not to sign the initial draft agreement. It was on that basis that the court decided to enforce the agreement. Meeks received the benefits that the final agreement gave him, as we have discussed above, the most primary of which was to shield his interest in Delaware Elevator from equitable distribution.

### 3. *Unfair advantage to Meeks/unfair detriment to Dashiell absent estoppel.*

This issue also is straightforward and for the most part has been covered. By maintaining in the divorce case that the alimony waiver was removed as a concession to Davis, without informing the court that that was not the case, and indeed the alimony waiver language was omitted due to his lawyer's error, Meeks gained unfair advantage in that: 1) he placed the court in the position of deciding the issue of enforcement without accurate information; 2) he placed the court in the position of deciding the issue of enforcement without information that would have weighed against enforcement; and 3) he kept the issue of reformation from the court. Meeks received the benefit of the court's enforcing the final agreement, which protected substantial assets—mainly his interest in Delaware Elevator—from equitable distribution.

Having successfully pursued the enforcement proceeding without disclosing, and indeed relying upon, inconsistent facts that could have given rise to reformation, or could have given rise to a finding that the parties never agreed to eliminate the alimony waiver clause (which would be a negative fact in a future malpractice claim against Dashiell), Meeks then negotiated an alimony settlement, knowing that he was going to turn around and sue Dashiell for the alimony amount. The ultimate unfair advantage Meeks would gain if allowed to pursue his inconsistent positions is protection of his most valuable property from equitable distribution and transfer of his alimo-

ny obligation (which is a distribution of his future income) to a third-party payor.

The unfair detriment to Dashiell is that, because Meeks took the position in the divorce case that the alimony waiver clause was negotiated out of the agreement, not omitted, Dashiell had no reason to, and could not, himself raise the issue of reformation or of no agreement between the parties on that issue; and now, in a malpractice case based on inconsistent facts, he is faced with potential liability for an alimony award Meeks agreed to pay.

For all these reasons, it is my strong conviction that, under the doctrine of judicial estoppel, this Court should not permit Meeks to pursue his legal malpractice action against Dashiell, and therefore should affirm the circuit court's grant of summary judgment in favor of Dashiell.

Chief Judge Murphy, Judge Salmon, Judge James Eyler, and Judge Krauser have authorized me to say that they agree with this dissenting opinion.